EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

SWITCHING SYSTEMS DIVISION OF
ROCKWELL INTERNATIONAL
CORPORATION, Defendant.

No. 89 C 4655.

United States District Court,
N.D. Illinois, E.D.

Jan. 16, 1992.

Jean Powers Kamp, John P. Rowe, U.S. E.E.O.C., Chicago, Ill., for plaintiff.

Thomas G. Abram, Richard H. Schnadig, Lawrence L. Summers, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant.

MEMORANDUM OPINION
AND ORDER

ILANA DIAMOND ROVNER, District Judge.

## I. INTRODUCTION

This is an action brought by plaintiff Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* The EEOC alleges that defendant Switching Systems Division of Rockwell International Corporation ("Switching") violated Title VII by discriminating against Hispanics and other non-American-born employees on the basis of

their national origin. The subject of plaintiff's claim is a corporate policy maintained by Switching pursuant to which an employee who falsifies information on an application for employment, and subsequently is discovered to have done so by Switching, is terminated without consideration of any mitigating circumstances. The EEOC has challenged this policy, contending that it has a disparate impact upon employees born outside the United States. Therefore, the EEOC alleges that the policy is a form of national origin discrimination prohibited by Title VII. Pending before the Court are cross-motions for summary judgment with respect to a stipulated statement of undisputed facts. For the reasons enumerated below, the Court will deny the EEOC's motion and will grant summary judgment in favor of defendant.

## II. FACTS

Switching is a division of Rockwell International Corporation ("Rockwell"). (Joint Statement ¶ 1.)[1] Rockwell operates four major businesses at more than 160 separate facilities. (*Id.*) Rockwell maintains corporate policies which govern the conduct of its businesses. These policies apply to all facilities operated by Rockwell, including Switching. (*Id.* at ¶ 2.) Rockwell Corporate Policy A–08, the policy at issue in this case, provides that " '[n]o false, misleading or artificial entries are [to be] made in the books and records of the Corporation.' " (*Id.* (quoting Corporate Policy A–08).) The Rockwell policy does not specify the disciplinary action that shall be taken in response to a breach of this policy by an employee of the corporation; instead, each of Rockwell's divisions and/or operations is responsible for adopting and implementing its own policies and procedures for enforcing Rockwell's corporate policies. (*Id.* at ¶¶ 3–4.) Pursuant to that authority, Switching has adopted and maintains Policies A–13 and A–14, which apply to its salaried and hourly employees. These poli-

cies include in the offenses warranting "immediate dismissal" from defendant's employment: " '[f]alsifying employment application or medical questionnaire' " and (2) " '[f]alsifying work records.' " (*Id.* at ¶ 5 (quoting Switching Policies A–13 and A–14.)) In contrast to Switching, other units of Rockwell do not require immediate dismissal for the above offenses; those units instead have adopted policies "which permit consideration of extenuating circumstances in determining the appropriate discipline for falsification of Company records." (*Id.* at ¶ 9.)

Between February 27, 1984[2] and March 23, 1989, Switching discharged fourteen of its employees for violations of the falsification policies set out above. (*Id.* at ¶ 6.) Four of those employees were dismissed for falsifications on their employment applications; the four were aliens of various national origins who were not entitled to work in the United States at the time they submitted the falsified applications. For example, Switching hired Steve Akinsola on March 27, 1987 and terminated his employment on April 15, 1987. Akinsola had falsified his employment application by stating that he was a citizen of the United States when actually he was an alien of Nigerian national origin who could not be employed in this country. (*Id.* at ¶ 6(a).) Switching hired Ector Bejar, an individual of Mexican national origin, as a temporary employee on July 23, 1984, and dismissed him on September 20, 1984, after discovering that Bejar had "falsified his name, social security number and citizenship status on his employment application." (*Id.* at ¶ 6(b).) When he had made application to Switching, Bejar was an alien who was not entitled to work in the United States. (*Id.*) Ramon Garcia, also an individual of Mexican national origin, was hired by Switching on February 27, 1984. His employment was terminated on April 8, 1988, after Switching discovered that he had falsified

---

**1.** In conjunction with their cross motions for summary judgment, the parties have submitted a joint statement of undisputed material facts. The facts described herein are taken from that joint statement.

**2.** By agreement of the parties, the time period relevant to this case has been limited to on or after January 1, 1984. (EEOC Mem. in Support of Motion for Summary Judgment at 3 n. 2.)

his social security number on his employment application, as well as on other company records. (*Id.* at ¶ 6(f).) At the time of his application, Garcia was an alien who could not be employed in the United States; at the time of his discharge, however, Garcia had become a legal resident alien. (*Id.*) Finally, Switching hired Ana Sota on June 17, 1980, and terminated her employment on February 25, 1987. Sota purportedly had utilized a false name and social security number on her application for employment and medical leave of absence documents. (*Id.* at ¶ 6(1).) Sota was an alien of Mexican national origin at the time she submitted her application to Switching, but by the time of her discharge, she had become a United States citizen. (*Id.*)

The remaining ten employees who were dismissed pursuant to the Switching falsification policies were Caucasians of American origin. (*Id.* at ¶ 6(c)–(e), (g)–(k), (m)–(n).) None of those ten employees were terminated for falsifying information on an employment application, however. Instead, they had falsified such items as time sheets, time records, expense reports, and production records. (*Id.*) Moreover, one employee was dismissed for falsifying information because he was working for a competing company at the same time that he was employed by Switching. (*Id.* at ¶ 6(g).)

At least since February 27, 1984, upon learning of a violation of the above sections of Policies A–13 and A–14, Switching has terminated the employment of each and every offending employee. (*Id.* at ¶ 7.) But for the above-described violations of the company's policies, none of the fourteen employees would have been discharged by Switching. (*Id.*)

In the course of discovery in this case, Rockwell provided information relating to eighty-two of its employees who were employed at units or divisions other than Switching and who were disciplined for falsifying information on their employment applications. (*Id.* at ¶ 10.) From the materials produced by Rockwell, it was not possible to determine the national origin of most of these employees. (*Id.*) Eighty of these eighty-two employees were discharged as a result of their falsifications. Of the remaining two, an employee of American national origin was disciplined for erroneously listing an academic degree on her application; her wages were reduced by ten percent. (*Id.*) The other, an individual of unknown national origin, faced a reduction in pay and a six-month extended probationary period after it was discovered that he had falsified information on his employment application. (*Id.*)

## III. ANALYSIS

On a motion for summary judgment, the moving party bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991); Fed.R.Civ.P. 56(c). The Court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-movant, and where there are doubts as to whether a genuine factual dispute exists, the Court must resolve those doubts in favor of the non-moving party. *Griffin*, 929 F.2d at 1212; *see also New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1477 (7th Cir.1990). The instant cross motions for summary judgment are submitted pursuant to stipulated facts. Accordingly, the Court's task is to determine on the basis of those facts which of the parties has established entitlement to judgment as a matter of law. *See Market Street Associates Limited Partnership v. Frey*, 941 F.2d 588, 590 (7th Cir.1991); *Commercial Union Insurance Co. v. Ramada Hotel Operating Co.*, 852 F.2d 298, 300 (7th Cir.1988).

### A. *Disparate Impact Claims Under Title VII.*

As the Supreme Court explained in *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 645, 109 S.Ct. 2115, 2118, 104 L.Ed.2d 733 (1989),

> Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) makes it an unfair employment practice for an employer to discriminate against any individual with

respect to hiring or the terms and condition of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely affect any employee because of the employee's race, color, religion, sex, or national origin.

Title VII proscribes "not only overt discrimination but also practices that are fair in form but discriminatory in practice." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *see also Wards Cove*, 490 U.S. at 645, 109 S.Ct. at 2119; *Maganuco v. Leyden Community High School District 212*, 939 F.2d 440, 443 (7th Cir.1991). Under this "disparate impact" theory of liability, "a facially neutral employment practice may be deemed violative of Title VII without evidence of the employer's subjective intent to discriminate...." *Wards Cove*, 490 U.S. at 645–46, 109 S.Ct. at 2119; *see also International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In short, the employer's motive in adopting and implementing a challenged practice is irrelevant to a disparate impact case. *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 297 (7th Cir.1991).

■ In order to make out a prima facie case of disparate impact, the EEOC must: (1) identify the specific employment practice challenged; (2) demonstrate that the challenged practice had a disparate impact on employment opportunities for a group protected by the statute; and (3) establish a causal link between the disparate impact and the challenged employment practice. *Wards Cove*, 490 U.S. at 655–58, 109 S.Ct. at 2124–25. In establishing their prima facie case, "disparate-impact plaintiffs generally rely on statistical evidence showing the disproportionate effect of the challenged employment practice on members of the protected class." *Maganuco*, 939 F.2d at 443. If the EEOC is able to make out a prima facie case, the burden

then shifts to defendant to come forward with a business justification for its practice—that is, to show that the "challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2125–26; *see also Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1049 (7th Cir.1991) ("an employment practice that results in a disparate effect on a protected group might still survive Title VII if it is sufficiently job-related to constitute a business necessity"). Defendant's burden in this instance is one of production; the ultimate burden of persuasion with respect to the disparate impact theory remains at all times with the plaintiff. *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126; *Mozee*, 940 F.2d at 1049; *Allen v. Seidman*, 881 F.2d 375, 377 (7th Cir.1989).[3] Assuming that defendant comes forward with evidence of a valid business justification, plaintiff then bears the burden of demonstrating alternate employment practices which would serve the employer's business purpose but without the undesirable discriminatory effect. *Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126; *Allen*, 881 F.2d at 377. By making such a showing, plaintiff would prove that the employer was utilizing the challenged practice " 'merely as a "pretext" for discrimination.' " *Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126 (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975)).

### B. National Origin Discrimination Under Title VII.

Switching advances a number of grounds for an award of summary judgment in its favor. The Court finds one such ground dispositive and therefore does not address the alternative grounds advanced by defendant.

■ Switching maintains that the EEOC's claim actually is based upon the citizenship status of defendant's aggrieved

---

3. Defendant's business justification for its policy is not at issue here, for the EEOC admits that Switching has a legitimate interest in disciplining those employees who make false statements on employment applications or other company documents. (*See* EEOC Mem. in Support of Motion for Summary Judgment at 6.)

employees, rather than on their national origin. To defeat such a claim, defendant then relies upon the Supreme Court's decision in *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), for the proposition that practices which adversely affect individuals on the basis of their citizenship are not actionable under Title VII as claims of national origin discrimination. Admitting that discrimination on the basis of citizenship alone does not violate Title VII, the EEOC responds that defendant's policy does not differentiate between citizens and non-citizens, but instead, the policy singles out those individuals who once were illegal aliens and who were born in countries other than the United States for disparate treatment. Such a practice violates Title VII, according to the EEOC, because that statute's protections extend to discrimination against aliens. In plaintiff's view, therefore, because Switching's policy does not discriminate solely on the basis of citizenship, the *Espinoza* decision is not controlling.

In *Espinoza*, the Supreme Court considered the scope of Title VII's use of the term "national origin" in a case in which the plaintiff challenged an employer's longstanding policy against the employment of aliens. 414 U.S. at 87–88, 94 S.Ct. at 336. The Court concluded that "national origin," as used in Title VII, "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.* at 88, 94 S.Ct. at 336. Utilizing such a definition, the Court held that discrimination on the basis of national origin does not encompass claims solely grounded upon the citizenship status of a particular individual. *Id.* at 91–92, 94 S.Ct. at 338; *see also Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir.1991) ("Title VII does not, however, forbid discrimination on grounds of citizenship."); *Bhandari v.*

*First National Bank of Commerce*, 829 F.2d 1343, 1351 (5th Cir.1987) (en banc), *vacated*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558, *reinstated*, 887 F.2d 609 (5th Cir.1989), *cert. denied*, 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990); *Dowling v. United States*, 476 F.Supp. 1018, 1022 (D.Mass.1979); *Novak v. World Bank*, 20 Fair Empl.Prac.Cas. (BNA) 1166, 1167 (D.D.C.1979).

The Supreme Court did note, however, that "there may be many situations where discrimination on the basis of citizenship would have the effect of discriminating on the basis of national origin." *Espinoza*, 414 U.S. at 92, 94 S.Ct. at 338. For example, "a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination." *Id.* In those circumstances, the Supreme Court had no trouble concluding that Title VII "prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." *Id.* The Court concluded, however, that no such purpose or effect had been demonstrated by Espinoza.[4] In fact, although it maintained a policy against the hiring of aliens, the defendant generally was unconcerned with the national origin of a particular applicant. *See id.* at 93 & n. 5, 94 S.Ct. at 339 & n. 5. The determining factor in any hiring decision, therefore, was citizenship status, rather than an applicant's national origin. Switching submits that the Court's analysis in *Espinoza* precludes a claim of national origin discrimination in the instant case. This Court agrees.

The EEOC brings this action on behalf of "Hispanics and other non-American-born persons" who have been affected by

---

**4.** The Court's decision makes it clear, therefore, "that national origin discrimination and citizenship discrimination are distinct phenomena." *MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1146 (3d Cir.1988), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989); *see also Fortino*, 950 F.2d 389, 391–92; *Garcia v. Gloor*, 618 F.2d 264, 269 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). In discussing the *Espinoza* decision in *MacNamara*, the Third Circuit stated that "[i]nherent in the Court's reading of Title VII and its history, is a Congressional determination that a trier of fact can distinguish national origin discrimination from citizenship discrimination and, accordingly, that courts can impose liability on the basis of the former without imposing it for the latter." 863 F.2d at 1147.

Switching's policy of immediately terminating any employee who is found to have falsified information on his/her employment application. (*See* Complaint at 1.) The undisputed evidence establishes that three of the four persons terminated for falsifying either their citizenship status or their social security numbers were of Mexican national origin; the remaining employee was an alien of Nigerian national origin. (Joint Statement ¶ 6((a), (b), (f), (*l*).) When applying for employment with Switching, each of these prospective employees was an alien who was not entitled to work in this country. (*Id.*) To disguise this defect, each falsified certain information on the employment application in order to suggest that he/she indeed was a United States citizen and was employable in this country. Each was subsequently terminated for the falsification.

The Court agrees with Switching that any discrimination evident in these circumstances was based upon the lack of citizenship of the aggrieved individuals, and not upon their national origin. The four affected employees did not falsify information in order to disguise their national origin or the fact that they were not born in the United States. Instead, they falsified information because they were not citizens of this country, and accordingly, they could not lawfully be employed here. There is no suggestion that in dismissing these individuals, defendant was at all concerned with their national origin. Moreover, there is no evidence that Switching maintains different policies for those employees born in the United States and those born out of this country. Instead, it requires of all of its employees that they provide truthful information on their employment applications. *See Espinoza*, 414 U.S. at 93 n. 6, 94 S.Ct. at 339 n. 6. If the defendant in *Espinoza* could lawfully maintain a policy precluding the employment of aliens, then it is difficult for this Court to imagine how Switching's policy could violate Title VII. If it is lawful to refuse to hire aliens in the first instance, then it also must be lawful to terminate the employment of individuals who falsified their citizenship status on their employment applications. The challenged practice clearly discriminates, if at all, only on the basis of citizenship. As such, the claim is expressly precluded by the Supreme Court's decision in *Espinoza. See also Longnecker v. Ore Sorters (North America), Inc.*, 634 F.Supp. 1077 (N.D.Ga.1986) (granting summary judgment to employer where plaintiff's claim based upon preferential treatment of foreign nationals over United States citizens); *Dowling*, 476 F.Supp. at 1022 (plaintiff failed to state a claim under Title VII by alleging that the National Hockey League and the World Hockey Association "discriminated against him on the basis of his United States citizenship by hiring only Canadian referees.").

In attempting to avoid the deleterious effect of *Espinoza*, the EEOC relies heavily on the Supreme Court's statement in that case that aliens "are protected from discrimination under [Title VII]." *Espinoza*, 414 U.S. at 95, 94 S.Ct. at 340; *see also EEOC v. Arabian American Oil Co.*, —— U.S. ——, ——, 111 S.Ct. 1227, 1242, 113 L.Ed.2d 274 (1991) (Marshall, J., dissenting) ("as we indicated in [*Espinoza* ], Congress clearly communicated its intent to cover aliens working in this country by prohibiting discrimination against 'any individual.' "); *EEOC v. Tortilleria "La Mejor"*, 758 F.Supp. 585, 590 (E.D.Cal.1991). Consistent with that statement, the EEOC maintains that it is challenging a practice here which disparately impacts upon aliens or other persons who were not born in the United States. Plaintiff plainly is correct that Title VII's protections extend to aliens who may be in this country either legally or illegally. However, as the Supreme Court explained in *Espinoza*, although aliens are protected under the statute, "nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage." 414 U.S. at 95, 94 S.Ct. at 340; *see also Lopez v. Arrowhead Ranches*, 523 F.2d 924, 927 (9th Cir.1975). Instead, the extension of Title VII's protections to aliens means only that they too are protected from discrimination on the basis of some classification prohibited by the statute— that is, race, color, religion, sex, or national

orgin. *Id.* By relying solely on the fact that the affected individuals were aliens at the time they made application to Switching, the EEOC has failed to establish discrimination on the basis of their national origin, as opposed to their lack of citizenship status. *See Fortino,* 950 F.2d at 393.

What the EEOC essentially has attempted to do here is to equate alienage with national origin. It contends that discrimination disparately impacting on aliens does so on the basis of national origin because, by definition, an alien was not born in this country, and only someone born outside the United States would be required to falsify information relating to his/her citizenship status. The Supreme Court, however, addressed and rejected a similar argument in the *Espinoza* decision itself. There, the Supreme Court stated that

> [i]t is suggested that a refusal to hire an alien always disadvantages that person because of the country of his birth. A person born in the United States, the argument goes, automatically obtains citizenship at birth, while those born elsewhere can acquire citizenship only through a long and sometimes difficult process.

*Espinoza,* 414 U.S. at 93 n. 6, 94 S.Ct. at 339 n. 6. In response to this argument, the Supreme Court explained that "it is not the employer who places the burdens of naturalization on those born outside the country, but Congress itself, through laws enacted pursuant to its constitutional power '[t]o establish an uniform Rule of Naturalization.' " *Id.* at 93 n. 6, 94 S.Ct. at 339 n. 6 (quoting U.S. Const., art. I, § 8, cl. 4). Accordingly, an employer cannot be blamed for requiring its prospective employees at least to have commenced the required process of naturalization or, for that matter, to accurately report the status of that process at the time they submit applications for employment.

As further support for its contention that defendant's policy does not turn on the citizenship status of the affected employees, the EEOC relies on the fact that one of the four terminated employees, Ana Sota, had attained United States citizenship by the time she was discharged. According to plaintiff, therefore, defendant's policy disparately impacts upon those not born in the United States, and its effect is in no way contingent upon whether the affected individual was or was not a United States citizen. The Court finds plaintiff's argument unpersuasive.[5] Although Sota may have been a citizen at the time Switching discovered her falsifications and terminated her employment, she clearly was not a citizen when she applied for a position with defendant. Because of her lack of citizenship, Sota was compelled to falsify information in order to secure employment. If Sota had been a United States citizen when she made application, then presumably she would not have falsified her application, and she still would have a job with defendant. It is clear that Sota's citizenship status is not wholly dependent on her national origin. While her citizenship status could and did change as the result of her own actions, Sota's national origin remained the same.[6] Sota did not falsify information on her employment application because she was born outside the United States; she falsified information because she was not a citizen. The fact that she later attained citizenship status does not alter the basis for defendant's alleged discrimination.

---

**5.** The EEOC miscasts the Sota issue in terms of whether "Sota, a United States citizen, is barred from the protection of Title VII by the *Espinoza* decision." (EEOC Reply Mem. at 3 n. 1.) This unnecessarily confuses the issue. The pertinent question is whether Sota was subjected to discrimination on the basis of her national origin. Sota's citizenship status at the time of her termination, as opposed to the time of the falsification of the relevant documents, is of no moment to this determination.

**6.** Some courts have stated that Title VII, for the most part, focuses on discrimination against characteristics which are immutable. *Garcia,* 618 F.2d at 269 & n. 6; *Fernandes–Middleton v. Air India,* 1989 WL 222970, at *1, 1989 U.S.Dist. LEXIS 15709, at *3 (D.D.C. Dec. 28, 1989); *see also Thomas v. Rohner–Gehrig & Co.,* 582 F.Supp. 669, 675 (N.D.Ill.1984) (Grady, J.). As Sota's experience demonstrates, alienage or citizenship is not such a characteristic.

Finally, the decision in *League of United Latin American Citizens v. Pasadena Independent School District*, 662 F.Supp. 443 (S.D.Tex.1987), does not aid the EEOC's cause. Although the employer's policy at issue in that case was identical to that maintained by Switching here, the plaintiff brought that case pursuant to the Immigration Reform and Control Act of 1986 (the "IRCA"), and not pursuant to Title VII. The relevant section of the IRCA expressly prohibited discrimination on the basis of an individual's citizenship status. *See Pasadena*, 662 F.Supp. at 448; *see also* 8 U.S.C. § 1324b(a)(1)(B). As a result, the *Pasadena* court concluded that "a policy of terminating undocumented aliens for no other reason than that they have given employers a false social security number constitutes an unfair immigration-related employment practice under [the IRCA]. Only because of Plaintiffs' citizenship status have they been unable to secure valid social security numbers." 662 F.Supp. at 448. As the Court has discussed above, Title VII does not prohibit discrimination grounded solely on the citizenship status of the individual affected. Accordingly, the *Pasadena* decision is inapposite to plaintiff's claim.

In the end, the EEOC's claim of national origin discrimination simply cannot survive in the face of the Supreme Court's decision in *Espinoza*. Any disparate impact resulting from Switching's policy of immediately terminating any employee who falsified information on an employment application was not based upon the national origin of the aggrieved individuals. Accordingly, the EEOC claim is not actionable under Title VII.[7]

## IV. CONCLUSION

For the reasons set forth above, the EEOC's motion for summary judgment is denied, and summary judgment instead is

entered in favor of the defendant Switching Systems.

---

7. Because the Court has concluded that the alleged discrimination is not grounded on the national origin of the aggrieved individuals, it need not consider whether the EEOC satisfied the other requirements for a prima facie case of disparate impact under Title VII. Similarly, the Court also need not consider whether the alternate employment practice proffered by plaintiff—that Switching, like the other units of Rockwell, consider any extenuating circumstances in arriving at the appropriate disciplinary response to a falsification of company records—would equally serve the legitimate business purpose underlying Switching's policy.