Freddie **GUINYARD**, Willie Moore, Bill Gaskin, Charles Casey, Harold Evans, Valorie Jackson, Otis James, and Joseph Negron, Plaintiffs,

v.

**CITY OF NEW YORK,** Edward I. Koch, in the official capacity as Mayor of the City of New York, New York City Police Department, Benjamin Ward, in his official capacity as Police Commissioner of the City of New York, New York City Department of Personnel, Judith A. Levitt, in her official capacity as City Personnel Director, New York City Transit Police Department and Vincent Del Castillo, in his official capacity as Chief of the New York City Transit Police Department, Defendants.

No. 89 CV 1434.

United States District Court, E.D. New York.

Aug. 25, 1992.

Frederick K. Brewington, New York City, for plaintiffs.

O. Peter Sherwood, Corp. Counsel of the City of New York (Norma Kerlin, of counsel), New York City, for City defendants.

Albert C. Cosenza, Vice President and Gen. Counsel, New York City Transit Authority (Evelyn Jonas, of counsel), Brooklyn, N.Y., for Transit Authority defendants.

Elliot Wales, New York City, for intervenors.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs, seven Black and one Hispanic New York City Transit Authority police lieutenants, brought this action against the City of New York and various of its officers, agencies, agents and employees, alleging that they were denied promotion due to racial discrimination. The complaint invokes 42 U.S.C. §§ 1981, 1983, 1985, 1988, and 2000e–2 (Title VII), as well as the Thirteenth, Fourteenth, and Fifteenth Amendments.

The complaint also alleges breach of contract, fraud, and misrepresentation under state law. Plaintiffs say that this court has jurisdiction of the federal and constitutional claims under 28 U.S.C. §§ 1331 and 1343(3) and pendent jurisdiction of the state law claims.

I.

On February 28, 1987, plaintiffs along with other transit police lieutenants took the written portion of promotional examination 5605 (the Examination) for the position of captain. On June 27 and 28, 1987, they took the oral portion of the Examination. Of the 104 candidates who took the Examination, the City placed 74 on an eligible list for promotion.

At the time plaintiffs brought this action, no minority candidates had been promoted. Of the eleven Black and three Hispanic lieutenants who took the Examination, eight are named plaintiffs. Of the 74 candidates who passed, plaintiff Guinyard was number 33. The other plaintiffs were at the bottom third of the eligible list.

To date, the Authority has promoted 60 people from the 74 who passed. Retirements and other factors resulted in some of those originally ranked below 60 being promoted. Plaintiffs Jackson, Moore, and Negron have joined Guinyard as among those promoted.

Plaintiffs say that the defendants intentionally discriminated against them and that the composition and scoring of the oral, not the written, portion of the Examination was arbitrary, capricious, and highly subjective. They say that the defendants' actions and the administration of the Examination have had a disparate racial impact, preventing Blacks and Hispanics from becoming captains. Plaintiffs also say that the scoring system actually used for the Examination differed from the one described in the official notice, thereby violating their contractual rights.

In a Memorandum and Order, dated April 16, 1991, familiarity with which is assumed, this court denied the plaintiffs class certification on the ground that plaintiffs failed to meet the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1).

There are two categories of defendants. The City defendants, particularly the Department of Personnel and its Director, are responsible for developing and administer-

ing competitive civil service examinations, including the Examination, and for promulgating eligibility lists for promotion following scoring of an examination. The Authority is the employer of the plaintiffs. The Authority defendants promote personnel from the civil service lists prepared by the City Defendants.

The Captains Eligibles Association (the Intervenors), a group of white transit police lieutenants who took and passed the Examination, have intervened and are represented by separate counsel.

The City defendants joined by the Intervenors move to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 37, saying that plaintiffs have failed to comply with the scheduling orders of United States Magistrate Judge Allyne Ross. In the alternative, the City defendants, joined by the Authority and the intervenors, move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, saying that the plaintiffs cannot demonstrate a prima facie case of employment discrimination under Title VII of the Civil Rights Act of 1964 and cannot prove any element of their other claims.

Plaintiffs cross-move for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, asking for a declaration that there has been an adverse impact. Plaintiffs also seek sanctions pursuant to Federal Rule of Civil Procedure 11, saying that the defendants have made legal arguments in their papers that are not warranted by existing law nor a reasonable extension of existing law.

## II.

In arguing for dismissal for plaintiffs' alleged failure to comply with the magistrate's discovery orders, City defendants say that plaintiffs failed to answer directly questions asked in defendants' Second Set of Contention Interrogatories, in particular to give information as to the basis for a claim of adverse impact in the selection of Hispanic and Black candidates, as well as certain statistical data.

Plaintiffs responded to the interrogatories by submitting an evaluation of adverse impact made by Dr. Lance Seberhagen (Seberhagen Report). It identified the federal guidelines for evaluating adverse impact and analyzed the Examination results by three different statistical methods.

The City defendants say that this report does not answer the interrogatories in the form requested, and that such unresponsiveness warrants dismissal under Federal Rule of Civil Procedure 37(d)(2). In the alternative, City defendants in their brief ask that, pursuant to Federal Rule of Civil Procedure 37(b)(2)(B), the court not consider the Seberhagen Report on defendants' motion for summary judgment.

Neither sanction is warranted. The purpose of the defendants' interrogatories was to ascertain plaintiffs' legal theory and their statistical evidence to support their claim. While the Seberhagen Report does not present answers precisely in the form defendants sought, it does sufficiently set forth plaintiffs' theory and evidence to support it. It is true that parts of the Seberhagen Report combine Blacks and Hispanics, whereas the defendants requested information regarding the adverse impact on Blacks and Hispanics as individual groups. But defendants have been able easily to determine the result if Hispanics are excluded.

Whatever the shortcomings there are in plaintiffs' responses do not warrant the sanctions of either dismissal or preclusion of evidence for purposes of summary judgment. *See Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 515 (5th Cir.1985).

### III. Summary Judgment

Although defendants move for summary judgment on all claims, the court will consider only those contentions they have briefed, namely, whether plaintiffs can make a showing of adverse impact under their Title VII claim, whether plaintiffs can show a policy, custom, regulation or officially-adopted decision by the Authority defendants that would sustain a § 1983 claim for municipal liability, and whether plaintiffs' state law claims have merit.

The court will also consider plaintiffs' cross-motion for partial summary judgment

on the issue of adverse impact alone and for sanctions.

The court on its own motion dismisses plaintiffs' § 1983 claim as it relates to alleged violations of their rights under the Thirteenth and Fifteenth Amendments.

## A. *Disparate Impact*

■ In 1987 when plaintiffs took the Examination and indeed on May 3, 1989 when this case commenced, Title VII made it "an unlawful employment practice" for an employer to fail or refuse to hire or otherwise to discriminate against any individual as to compensation, terms, conditions, or privileges of employment "because of such individual's race, color, religion, sex, or national origin". 42 U.S.C. § 2000e–2(a)(1).

The statute contained no explicit reference to whether it forbade not only practices adopted with discriminatory intent but also practices that, though adopted without such intent, had a discriminatory effect or impact.

In 1971, the Supreme Court unanimously decided in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971), that absence of discriminatory intent did not redeem testing mechanisms that operated in practice as "built-in headwinds" for minorities and were unrelated to measuring job capability. The *Griggs* case and those Supreme Court and Circuit Court cases that followed it established that where the complaining party showed that an employment practice had a "disparate impact", the practice was unlawful unless it was required by "business necessity", which the employer had the "burden of showing".

As Judge Posner later said, it thereafter became "generally believed" that if the plaintiff in a Title VII case showed that a hiring criterion was disproportionately excluding members of a group protected by the statute, "the burden shifted to the employer" to persuade the court that the criterion "was necessary to the effective operation" of the business. *Allen v. Seidman*, 881 F.2d 375, 377 (7th Cir.1989).

On June 5, 1989, about a month after this action was started, the Supreme Court, vot-

ing five to four, in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657–59, 109 S.Ct. 2115, 2125–26, 104 L.Ed.2d 733 (1989), rejected the requirement that the challenged hiring or promotion practice be "essential" or "indispensable" to the business and decided that it was enough that the practice served the employer's legitimate employment goals in a significant, not insubstantial way.

The "business necessity" defense thus became a misnomer since the "defense" no longer required a showing of "necessity" and was really no longer an affirmative defense. *Seidman*, 881 F.2d at 377.

When the Civil Rights Act of 1991, Pub.L. 102–166, § 105(a), 105 Stat. 1071, 1074–75 (Nov. 21, 1991), became law, it had the evident purpose, among other things, of returning the law in disparate impact cases to its pre-*Wards Cove* state. Section 105 of that Law (105 Stat. 1074), amended what had been codified in 42 U.S.C. § 2000e–2 to add a new subsection providing in pertinent part that an unlawful employment practice "based on disparate impact" is established only if "a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity". 42 U.S.C. § 2000–e–2(k)(1)(A)(i).

Some courts have struggled with the question of the extent to which the Civil Rights Act of 1991 should be applied retroactively to cases pending before its effective date of November 26, 1991. The decisions are not consistent. *Compare e.g. Croce v. V.I.P. Real Estate, Inc.*, 786 F.Supp. 1141 (E.D.N.Y.1992) (Spatt, J.), *with Smith v. Petra Cablevision Corp.*, 793 F.Supp. 417 (E.D.N.Y.1992) (Amon, J.).

Because the case was brought before the statute became law and because section 105 of the statute simply returned the procedural prerequisites back to those in effect when the Examination was taken by

plaintiffs, it may well be that that section should be applied to this case. *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1445–46 (11th Cir.1991) (according to state law rules, although law may be both procedural and substantive, law which prescribes method of enforcement is procedural in nature and may be applied retroactively); *In re Resolution Trust Corp.*, 888 F.2d 57, 58 (8th Cir.1989) (if case pending when new statute passed, new procedural rules will usually be applied to it).

While that question may later become significant in this case, the court need not address it now. Defendants have not yet been called upon to submit any justification for whatever impact the administration of the Examination made. The only present issue as to disparate impact is whether either party is entitled on the papers to summary judgment as to whether or not the impact on Blacks and Hispanics was disproportionate.

As noted above, a plaintiff may make out a *prima facie* case under Title VII by showing that a hiring or promotion practice was adopted and administered with a discriminatory motive or by offering statistical or other evidence from which it may fairly be inferred as more likely than not that the practice had a discriminatory or disparate impact. *Waisome v. Port Authority of New York and New Jersey*, 948 F.2d 1370, 1374–75 (2d Cir.1991).

■ A *prima facie* case of disparate impact is established by showing either "a gross statistical disparity" or a "statistically significant adverse impact coupled with other evidence of discrimination". *Id.* at 1375. The Seberhagen Report, using the statistics supplied by defendants, bases it conclusions on the number of promotions, thirty-three, that had been made when the report was made. Seberhagen analyzed the impact of the five major components of the Examination, namely, technical test, administrative test, oral exam part I, oral exam part II, and final exam score. He used three different methods of analysis, (a) Uniform Guidelines Procedures (*i.e.* 80% Rule and 80% Rule + 1), (b) Statistical significance of selection rates, and (c) Statistical significance of correlation between test scores and race.

He concluded with respect to the Uniform Guidelines that because the selection rates for Blacks and for minorities (Blacks and Hispanics) was less than 80% of the selection rate for whites on the administrative test, oral exam part I, oral exam part II, and final score, there was an indication of adverse impact. He found no adverse impact against Hispanics alone on any part of the test, although none was promoted, because the size of the group was too small to provide reliable statistics.

With respect to the statistical significance of selection rates, Seberhagen found statistically significant differences in selection rates between whites and minorities (*i.e.* Black plus Hispanic) on the oral I test and on final scores, indicating adverse impact, but no significant differences for Blacks or Hispanics as individual groups, primarily because each group was too small to provide reliable statistics.

With respect to the statistical significance or correlations, he found that "race" (which included both Blacks and Hispanics) had a statistically significant correlation with test scores for the administrative test, oral I, oral II, and final scores, indicating adverse impact.

Defendants say that Seberhagen's report is flawed. They say that it is now obsolete since the Authority has made additional promotions for a total of 60 and that the report should not have lumped Blacks and Hispanics together.

*Waisome* suggests three principles for analyzing adverse impact claims. First, the court stressed the importance of considering adverse impact at each stage of the promotion process. *Id.* at 1378.

■ Thus, while comparisons of the 74 who passed and of the 60 ultimately promoted are relevant, a showing of an adverse impact at the early stages of promotion, such as the 33 analyzed in the Seberhagen Report, is also important. Discrimination may be present at each step in the promotion process. Moreover, a delay in promotion may itself result in injury.

For example, of the two Hispanic candidates who were eventually eligible for promotion, one of them, Lieutenant Perez, retired prior to his promotion date. Even for those who were promoted, an illegal delay in promotion may still result in lost wages, benefits, and other types of injuries.

■ Another principle stated by *Waisome* underscores the significance of conducting adverse impact analysis for the first 33 promoted as well as for the 60 finally promoted and the 74 who passed the exam. When an examination serves the dual purpose of determining who passes as well as the order for promotion, a "clustering" of members of a protected group at the low end may be evidence of a disparate impact. *Id.* at 1377–78 and cases cited. Here, except for Guinyard, the rest of the plaintiffs were in the bottom third of the eligibility list.

This bunching effect does not in itself establish that the exam had a disparate impact, but it is some evidence of an adverse impact.

■ Third, *Waisome* also says that while statistics may be evidence of a disparate impact, they must be scrutinized for their reliability, especially when the sampling size is small. *Id.* at 1379 and cases cited. Out of a total of 104 people who took the Examination, only 3 were Hispanic; out of 74 people who passed, only 2 were Hispanic; out of 60 people promoted, only 1 was Hispanic, and out of the 33 promoted at the time of Dr. Seberhagens' report, none was Hispanic. The number of Black candidates, while larger in each group, comprises barely 10% of the total taking the Examination, 9% of those passing, 3% (*i.e.* 1 person) of the 33 in the Seberhagen Report, and 6% of all those eventually promoted. Such a small sample pool does not provide statistically decisive results.

Even slight variations in data lead to large differences in the result. Dr. Schmidt, the defendants' expert, and Dr. Seberhagen both employed the "80% Plus 1 Rule". That technique adds one more number to the actual number in a minority group to determine if that addition yields a number equal to 80% of the number of whites in that group. If so, then no adverse impact is presumed.

Of the 60 eventually promoted to captain, the promotion rate of Blacks was 59% that of whites. When one more Black is added, the promotion rate for Blacks becomes 74% of the white promotion rate—still below the 80% level but according to Dr. Schmidt, not evidence of adverse impact. The actual promotion rate of Hispanics was 54% of the white promotion rate. When an additional Hispanic is added, the promotion rate of Hispanics jumps to 110%. Plainly this test does not show an adverse impact as to Hispanics.

It was in an effort to compensate for this small database that Dr. Seberhagen analyzed the results for Blacks and Hispanics combined. Combining Blacks and Hispanics may produce a statistically more useful figure, but it does not necessarily produce a meaningful one. *Id.* at 1376, *citing Bilingual Bicultural Coalition on Mass media, Inc. v. Federal Communications Comm'n*, 595 F.2d 621, 642 n. 57 (D.C.Cir. 1978) (Robinson, J., dissenting in part) (statistical significance tells nothing of the importance, magnitude, or practical significance of a disparity).

It may be that for purposes of the test, Blacks and Hispanics are fungible because they face similar employment problems and prejudice. But there is no evidence in the record to substantiate this. Indeed some of the Hispanics may have sufficiently similar characteristics to justify placing them in the same statistical pool at least for purposes of the oral tests. All of this is a matter for proof at trial.

In sum, the statistical evidence does suggest adverse impact at varying phases of the promotion process. But the limitations of the data pool and subsequent statistical analyses offered by both parties fail to establish adverse impact as a matter of law.

Plaintiffs may be able to prove their *prima facie* case by adding to the statistical evidence other proof of discrimination. *Waisome* at 1375.

At this stage, the court finds that the present record does not justify summary judgment for either side. The Magistrate Judge may permit such reasonable additional discovery to both parties as is consistent with this memorandum.

Plaintiffs' motion for sanctions is denied.

### B. *The Transit Authority Defendants*

■ In addition to joining the other motions, the Authority defendants seek summary judgment as to the § 1983 claim, saying that plaintiffs have not alleged and can not prove that it had a policy, custom or usage sufficient to establish a civil rights violation. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Plaintiffs say that the promotion exam itself "reflects [a] *per se* municipal policy", and seek Rule 11 sanctions against the Authority for maintaining otherwise.

The Authority says that it did not prepare, administer, or score the Examination but merely promoted candidates from an eligible list compiled by the City, and that its reliance on the eligible list is not a policy or practice sufficient to support municipal liability.

But the Authority is responsible for promotion decisions. It decided how many lieutenants to promote and when those promotions would be made. Similarly, the decision to promote 60, through December 31, 1991, and then to go to another eligible list based on another test may or may not be evidence of racially discriminatory policy.

Neither side has addressed any of these issues. The Authority defendants' motion is denied. Plaintiffs' motion for sanctions is denied.

### C. *State Law Claims*

The defendants also seek summary judgment on the pendent state claims of breach of contract, fraud, and misrepresentation. The defendants say that plaintiffs have not met the New York General Municipal Law § 50–e and New York City Administrative Code, § 7–201 requirements for filing a notice of claim against the City and that they have not provided any evidence supporting the claims.

### 1. Notice of Claims

■ Despite characterizing all three claims as a tort in their complaint, the plaintiffs now say that the claims arise in contract and that they are therefore not required to file a notice of their claim. Although fraud and misrepresentation are traditionally considered torts, New York courts have held that a notice of claim under § 50–e is not necessary when alleging fraud and breach of contract against a municipal corporation. *Hoydal v. City of New York*, 154 A.D.2d 345, 346, 545 N.Y.S.2d 823, 824 (App.Div.2d 1989) ("a cause of action will be found to sound in tort rather than in contract only when the legal relations binding the parties are created by the utterance of a falsehood, with fraudulent intent and reliance thereon, and the cause of action is entirely independent of contractual relations between the parties"); *Everston v. State of New York Mortgage Agency*, 1992 WL 6190 (S.D.N.Y. Jan. 3, 1992) (same as applied to race and age employment discrimination suit against municipal corporation). This court must adopt a state court's interpretation of its own laws and regulations.

### 2. Contract

■ Plaintiffs in their complaint allege that the defendants breached an implied contract between them and the plaintiff-employees when the city notified the test takers that the Examination would be evaluated one way but then actually scored it another. As evidence of this contract, plaintiffs rely upon Guinyard's deposition in which he alleges that the scoring method used on the exam differed from what the notice of examination informed him it would be.

Even affording the most generous interpretation to Guinyard's state of mind regarding the Examination notice, this court finds that his testimony does not support the contention that he entered into a contract with defendants at the time they provided notice of the captain's exam. Nor

does anything else in the record provide such support, since plaintiffs have failed to submit a copy of the notice or a verified description of the scoring method used. *Cf. Patterson v. McLean,* 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989) (promotion claim may be actionable under § 1981 governing the making and enforcing of contracts if "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer").

Defendants' motion for summary judgment as to the claims under state law is granted.

So ordered.