Roslyn **FEDER, M.D., Ph.D., Plaintiff,**

**v.**

**BRISTOL–MYERS SQUIBB COMPANY, Defendant.**

No. 97 Civ. 7030 (LAK).

United States District Court, S.D. New York.

Jan. 20, 1999.

---

Judith P. Vladeck, Laura S. Schnell, Peter S. Rukin, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for Plaintiff.

Bettina B. Plevan, James M. Beach, Katharine H. Parker, Proskauer Rose LLP, New York City, for Defendant.

## OPINION

KAPLAN, District Judge.

This is a so-called "glass ceiling" case. Roslyn Feder, M.D., Ph.D., a senior vice president in the Worldwide Medicines Group at Bristol–Myers Squibb Company ("BMS"), alleges that defendant, motivated by gender animus solely on the part of the president of her group,[1] denied her advancement in the

company in violation of Title VII of the Civil Rights Act of 1964 and comparable state and local laws.[2] Feder claims also that BMS retaliated against her for complaining of bias, filing a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"), and filing this lawsuit. She asserts a common law breach of contract claim as well.

The Court previously granted in part and denied in part defendant's motion for summary judgment dismissing Feder's claims. This opinion sets forth the basis for that decision.

### Background

Dr. Roslyn Feder entered college at 16 and a joint M.D./Ph.D program at 19. In 1984, she received both an M.D. from Cornell University Medical School and a Ph.D. in cell biology from Rockefeller University. She spent the following two years working as a senior consultant for Arthur D. Little, Inc. while completing a clinical fellowship in pediatrics at the Harvard Medical School.[3]

Although Feder had no formal business education,[4] she began a business career in 1988 when she accepted a position with Sandoz Pharmaceuticals Corporation ("Sandoz") as assistant director of licensing. She was promoted twice during the next six years, attaining the position of executive director of Business Development and Licensing.[5]

### Feder Hired by BMS

Feder's career at Sandoz was not an entirely happy one. Her position involved no direct managerial responsibilities,[6] she believed that she was "not always well liked," [7] and she felt that she was not fairly compensated.[8] By some time in 1994, she concluded that she had learned all that she could at Sandoz and contemplated leaving.[9] Feder

---

1.  Pl. Resp. to Def. First Set of Interrogs., Interrog, No. 1; *see also* Pl. Mem. 4–8.

2.  42 U.S.C. § 2000e, *et seq.;* N.Y. Exec. L. § 290, *et seq.* ("NYSHRL"); N.Y.C. Ad C. § 8–101, *et seq.* ("NYCHRL"); N.J. Stat. Ann. § 10:5–1, *et seq:* ("NJLAD").

3.  Feder Aff. ¶¶ 2, 3.

4.  Feder Dep. 5–6.

5.  *Id.* ¶ 4.

6.  Feder Dep. 125.

7.  *Id.*

8.  *Id.* at 114.

9.  *Id.* at 68.

was interested in finding a new position that would further her goal of a "high powered, quick trajectory career" and bring her "power, money, career development and growth." [10]  At the same time, BMS, an international pharmaceutical company with headquarters in New York, was searching to fill the position of vice president, Worldwide Business Development and Licensing in its Pharmaceutical Group.

In February 1995, with the approval of Kenneth Weg, president of the Pharmaceutical Group,[11] BMS offered this position, which reported to Dr. Andrew Bodnar, then president, Oncology/Immunology and Worldwide Strategic Business Development, to Feder. Feder testified at her deposition that Kenneth Sloan, senior vice president of Human Resources for the Pharmaceutical Group, told her "that he expected—that it was the expectation that Dr. Bodnar would not remain in this position long, and that . . . it was the expectation that [she] would succeed Dr. Bodnar in his position." [12]  According to Feder, she relied on this statement in accepting BMS's offer.[13]

*Hayden's 1995 Promotion*

The forecast that Bodnar would not long remain in his position proved correct, but the alleged expectation as to Bodnar's successor did not.  In September 1995, Bodnar was transferred out of the Pharmaceutical Group and the position he held restructured.[14]  But Weg promoted Donald Hayden, Jr., then responsible for BMS's oncology-immunology business, rather than Feder into the restructured position.  Hayden, a 14-year veteran of BMS, was given responsibility for both the Franchise Management and Business Development and Licensing units, the latter of which was headed by Feder.  In this capacity, he began reporting directly to Weg.[15]  Feder, who now argues that she should have reported directly to Weg, began reporting to Hayden.[16]

*The February 1997 Reorganization*

In late 1996 or early 1997, Weg decided to reorganize the Pharmaceutical Group.  Under his initial proposal, Hayden would have replaced Samuel Hamad, then president of Intercontinental.[17]  Richard Hinson, an experienced executive who nevertheless was relatively new to BMS, would have replaced Hayden as senior vice president for Worldwide Franchise Management and Business Development.[18]  Christine Poon, another woman in BMS' Pharmaceutical Group, would have reported to Hayden while Feder would have reported to Hinson.[19]

Poon objected to the proposed reorganization.  It appears that she thought she ought to report to Weg, inasmuch as he had run BMS's Latin American operations at one time, and that reporting to him would be an important career development for her.[20]  Hayden too disagreed with the proposed structure, believing it inappropriate for Poon and Feder, each of whom was quite experienced in her area, to report to Hayden and Hinson, respectively, because Hayden and

10.  *Id.* at 138–39, 144–45.

11.  Now known as the Worldwide Medicines Group.

12.  *Id.* at 137.

The manner in which Feder responded to the question at her deposition—she began to attribute the expectation that she would succeed Bodnar to Sloan personally and then seemingly caught herself and rephrased her answer in a manner that would permit attribution of that expectation to a broader group at BMS—raises an issue as to Feder's candor.  Nevertheless, as this is a motion for summary judgment, the Court accepts the rephrased version for purposes of the motion, as it is more favorable to Feder.

13.  Feder Aff. ¶ 6.

14.  The restructured position—senior vice president, Worldwide Franchise Management and Business Development—was comprised of Bodnar's previous responsibilities other than those related to the oncology and immunology business.  Weg Dep. 215, 233–34.

15.  Hayden Dep. 23; Tharp Dep. 151.

16.  Weg Dep. 215.

17.  Intercontinental consisted of BMS's markets outside of the United States and Canada.  Hayden Dep. 39.

18.  Tharp Dep. 76–77, 95; Hayden Dep. 38–39.

19.  Hayden Dep. 42; Tharp Dep. 95.

20.  Weg Dep. 162–63.

Hinson had comparatively little experience in their specific new areas of responsibility.[21] Faced with this opposition, Weg revised the proposal. He promoted both Poon and Hayden and divided Intercontinental between them, making Poon responsible for Latin America and Canada and Hayden for all other non-European international markets.[22] Weg also restructured Hayden's prior position, separating Franchise Management from Business Development and Licensing. Hayden maintained responsibility for Licensing and Business Development,[23] and Hinson was promoted to senior vice president for Worldwide Franchise Management. Feder, her position unchanged, continued to report to Hayden. She, however, was designated to lead a "high impact initiative" for external development[24] and appointed to the Worldwide Medicines Group operating committee.[25]

Shortly after the announcement of these organizational changes, Feder expressed her dissatisfaction with the reporting structure to Weg[26] and subsequently conveyed to Charles Tharp, executive vice president for Human Resources, her belief that gender discrimination was the reason she had been denied a promotion and a direct reporting relationship to Weg.[27] According to Tharp, Feder asked

that BMS rectify the situation. She made reference, in the alternative, to a potential separation package.[28] BMS did not acquiesce in either alternative. In April 1997, Feder, through counsel, informed Charles Heimbold, BMS' chief executive officer, of her intention to file a lawsuit predicated on claims of gender discrimination.[29] Feder filed a charge of discrimination with the EEOC the following August 1[30] and this lawsuit in September.

*The November 1997 Reorganization*

In the middle of 1997, the decision was made to reassign Feder's licensing responsibilities to Dr. Peter Ringrose, who headed BMS's research and development group. the Pharmaceutical Research Institute ("PRI").[31] BMS informed Feder of this change in November 1997 and it went into effect on December 1. At the same time, Weg gave Feder a new title—senior vice president of External Development—made her a member of his executive committee, and had her report directly to him.[32]

In December, Feder amended her complaint, adding the claim that the transfer of Licensing, notwithstanding her enhanced title and direct reporting relationship to Weg,

21. Hayden Dep. 42.

22. Weg. Dep. 158–67; Hayden Dep. 40.

23. Hayden Dep. 39–40, 48.

24. Weg Dep. 337; Plevan Aff. Ex. L. As part of the February 1997 reorganization, Weg created four "high impact initiatives" focusing on different issues affecting the Worldwide Medicines Group. Plevan Aff. Ex. L.

25. Plevan Aff. Ex. L; Feder Dep. 323. Weg created also a smaller executive committee to focus on strategy. Feder was not a member. Weg Dep. 230; Plevan Aff. Ex. L.

26. Feder first voiced her concerns in a letter to Weg, Charles Heimbold, BMS' chief executive officer, and Charles Tharp. *See* Plevan Aff. Ex. M. These concerns were the subject also of a subsequent meeting between Feder and Weg. Weg Dep. 185; Feder Dep. 322–324.

27. Feder Dep. 340–41; Tharp Dep. 102–08.

28. Tharp Dep. 103.

29. Plevan Aff. Ex. N.

30. Schnell Aff. Ex. G.

31. Weg Dep. 100–105, 114. The date at which the decision is made is not clear in the record. At one point Weg stated that the decision was made "mid–1997," Weg Dep. 100. Weg later stated that he first raised the issue with Heimbold in August 1997. *Id.* at 104.

32. Weg. Dep. 129–130; Plevan Aff. Ex. R.
The parties disagree, both internally and with each other, on whether this change is properly characterized as a "promotion." BMS's memorandum refers to it as a promotion. *See* Def. Mem. 10. In his deposition, Weg said that he thought the word "appointed" a more appropriate term than "promoted" because Feder was not given a salary grade level increase, but testified also that "in terms of reporting relationship and membership on the executive committee, it could be considered a promotion." Weg Dep. 145. Feder's Rule 56.1 Statement claims the change was not a promotion. *See* Pl. 56.1 ¶ 64. In the complaint, however, she acknowledges that "the reporting relationship [with Weg that she was given at the time] by definition entails a promotion." Am. Cpt. ¶ 20.

was made in retaliation for the filing of this lawsuit.

### Feder's Allegations

Feder alleges that Weg discriminated against her on account of her sex [33] when she was not promoted in September 1995 and February 1997.[34] Specifically, she claims that (1) she was the most qualified person in the Worldwide Medicines Group to replace Bodnar in 1995 and should have received the promotion to succeed Bodnar over Hayden,[35] and (2) she should have been promoted to a reporting relationship with Weg in February 1997.[36] These missed promotions, argues Feder, had a negative effect on her reputation and her compensation.[37]

Feder's allegation of unlawful retaliation is based on the November 1997 reassignment of her licensing responsibilities to Ringrose, which she contends was done in retaliation for her April 1997 letter to Heimbold and Weg, her August 1997 EEOC charge, and the filing of this lawsuit. Feder makes a contract claim as well, alleging that BMS breached its agreement when it did not promote her to succeed Bodnar.

### Discussion

### I. Discrimination Claim

#### A. Basic Principles

Under Title VII of the Civil Rights Act of 1964, as amended,[38] an employer may not discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment nor otherwise adversely affect the employee's job status on the basis of the employee's sex.[39]

■ In *McDonnell Douglas Corp. v. Green,*[40] the Supreme Court set forth the "allocation of the burden of production and an order for the presentation of proof" applicable to Title VII cases. This formulation is applicable as well to cases under the comparable New York and New Jersey statutes upon which Feder relies.[41]

Under *McDonnell Douglas,*the plaintiff bears the initial burden of establishing a *prima facie* case.[42] Here, Feder must show (1) membership in a protected class, (2) qualification for the position she sought, (3) an adverse employment action with respect to that position, and (4) either that a position she sought was filled by a person not in the protected class or that a promotion was denied or other adverse employment action taken in circumstances giving rise to an inference of discrimination.[43] The plaintiff's burden in establishing the *prima facie* case is "minimal." [44]

Establishment of the *prima facie* case generates a presumption that the employer en-

---

**33.** Pl. Resp. to Def. First Set of Interrogs., Interrog. No. 1; *see also* Pl. Mem. 4–8.

**34.** Am. Cpt. ¶¶ 13, 17. It appears that plaintiff complains of the failure of BMS to promote her in February 1997 in addition to contending that the incident reflects gender bias on Weg's part.

**35.** *Id.* ¶ 14.

**36.** Pl. Mem. 5–6.

**37.** Am. Cpt. ¶ 20.

**38.** 42 U.S.C. § 2000e, *et seq.* (1998).

**39.** *Id.* § 2000e–2(a).

**40.** 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**41.** *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997) (N.Y.SHRL); *Waldron v. SL Industries, Inc.,* 56 F.3d 491 (3d Cir.1995) (NJLAD); *O'Mal-*

*ley v. AIDS Institute,* No. 95 Civ. 5561(PKL), 1996 WL 447748, at *4 (S.D.N.Y. Aug. 7, 1996) (N.Y.CHRL).

**42.** *Fisher v. Vassar College,* 114 F.3d 1332, 1355 (2d Cir.1997) (*in banc*), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

The Court is mindful of Judge Chin's thoughtful opinion arguing for the rejection of the *McDonnell Douglas* approach in considering summary judgment motions in discrimination cases. *Lapsley v. Columbia University–College of Physicians & Surgeons,* 999 F.Supp. 506, 514–15 (S.D.N.Y.1998).

**43.** *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995).

**44.** *Fisher,* 114 F.3d at 1335 (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also id.* at 1340 n. 7 (collecting cases).

gaged in unlawful discrimination.[45] The plaintiff at that point is entitled to proceed to the jury unless the defendant "comes forward with a non-discriminatory reason for the action complained of."[46] Articulation of a legitimate, non-discriminatory reason rebuts the presumption created by the *prima facie* showing, leaving only the ultimate question of whether the plaintiff has proved intentional discrimination. In order to establish intentional discrimination, the plaintiff must prove that (1) the legitimate, non-discriminatory explanation proffered by the defendant is pretextual, or false, and (2) gender discrimination was a determinative factor in the decision.[47]

## B. *The* Prima Facie *Case*

### 1. *Membership in Protected Class*

Feder is a member of a class protected by Title VII. In consequence, the first element of her *prima facie* case concededly is satisfied.

### 2. *Material Adverse Employment Action*

BMS tacitly acknowledges that the failure to promote Feder to Bodnar's position in September 1995 was a material adverse employment action and that the second element of the *prima facie* case is satisfied as to that aspect of her claim.[48] It argues, however, that the February 1997 reorganization had no material adverse effect on Feder because she was not denied a particular position she had sought, and there was no change in her then-current job.[49] But BMS takes too narrow a view of Feder's contentions.

First, Feder's allegation is not merely that she was not promoted from one position to another, but that she was denied a reporting relationship to Weg and that such a reporting relationship would have carried incidents of a promotion such as increased compensation and prestige.[50] Second, Feder argues that she ought to have been considered for the "combined position of Franchise Management and Business Development and Licensing."[51] In order to give determinative effect to the elimination of the position, one necessarily must conclude that the organizational change was made for *bona fide*, non-discriminatory reasons. In other words, one must conclude that Weg decided to eliminate the position on the merits and not in whole or in part to avoid filling it with a woman. As explained in greater detail below, this inappropriately would put the cart before the horse by collapsing the determination of the merits of the claim of discrimination into the determination whether the plaintiff has made out a *prima facie* case.

This Court is not prepared to say, on this record, that no trier of fact reasonably could conclude that Feder suffered a material adverse employment action when (i) the position to which she aspired was eliminated, thereby arguably foreclosing a logical promotion path, and (ii) she was not given the direct reporting relationship to Weg. Feder therefore has made out a *prima facie* case as to the February 1997 events as well.[52]

45. *Id.* at 1335 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

46. *Id.* (citing *St. Mary's Honor Center*, 509 U.S. at 509).

47. *Id.* at 1336; *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 317 (2d Cir.1992).

48. BMS's opening memorandum asserted broadly that Feder's claims of adverse treatment were *de minimis* and that she failed to establish a *prima facie* case. Def. Mem. 13–15. In response to plaintiff's subsequent contention that it had conceded that Feder complained of material adverse employment actions, Pl. Mem. 13–14 n. 8, BMS claimed only that there was insufficient evidence of any adverse employment action in 1997. Def. Reply Mem. 1.

49. Def. Reply Mem. 2.

50. *See* Am. Cpt. ¶ 20; Weg Dep. 145.

51. Pl. Mem. 6. That the position was eliminated as part of the reorganization, Def. Reply Mem. 2, is of no moment for purposes of determining whether she has made out this element of her *prima facie* case.

52. The Second Circuit recently held that a plaintiff does not present a *prima facie* case of discrimination when she or he fails to allege a specific job for which the plaintiff applied and to which she or he had not been promoted "rather than merely asserting that on several occasions she or he generally requested promotion." *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir.1998). While *Brown* is pertinent here, the

### 3. Qualifications

The question whether Feder was qualified for the positions she sought is more difficult. BMS argues that she was not qualified in the sense that her ample skills did not meet its particular, albeit necessarily subjective, requirements as well as the available alternative candidates. Feder, on the other hand, attacks BMS's professed requirements and evaluations as pretextual. The dispute thus raises a fundamental difficulty in determining whether alleged discrimination victims in professional and managerial contexts are "qualified" for *McDonnell Douglas* purposes.

In *Powell v. Syracuse University*,[53] the Second Circuit warned that courts must be careful not "unnecessarily [to] collapse[ ] the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work."[54] *Powell* thus specifically rejected the proposition that the qualification test, in the case of a plaintiff who had not been reappointed to a prior position, should "requir[e] the employee to prove not merely that he possesses the basic skills necessary for the job, but rather that he is the best-qualified candidate for the job, under the criteria suggested by the employer."[55] Instead, *Powell* found that the correct standard simply was whether the plaintiff had come forward with evidence of satisfactory job performance.[56]

*Powell'*s strict enforcement of the boundaries between the stages of the *McDonnell Douglas* test was called into question by the Second Circuit's subsequent decision in *Lieberman v. Gant*.[57] Judge Friendly there held for the Court that the *Powell* standard of satisfactory performance was not an appropriate measure of qualification where the plaintiff complained not that he had lost his job, but that he was not given tenure.[58] Significantly, Judge Friendly explicitly relied on the employer's standards in concluding that there is a considerable difference in the qualifications for maintaining one's job and for obtaining the tenure. The Court reasoned that this difference should be reflected in a higher standard in the latter case.[59] *Lieberman* thus stands for the sensible propositions that there is no "one-size-fits-all" qualification standard and that the qualification requirement instead must be tailored in some fashion to the nature of the employment action involved. That *Lieberman'*s tailoring principle requires reference to the employer's criteria was confirmed in *Thornley v. Penton Publishing, Inc.*,[60] where the Circuit stated that

> "a plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance. We adhere to the position that a plaintiff must satisfy the employer's honestly-held expectations."[61]

---

Circuit recognized also that the requirements of the *McDonnell Douglas* test are subject to modification "where the facts of a particular case make an allegation of a specific application a quixotic requirement." *Id.* Such is often the case when dealing with senior executives. There is no evidence, and it would not be unreasonable for a trier of fact to presume that none exists, that formal applications are part of the promotion process at BMS for executives at Feder's level.

**53.** 580 F.2d 1150 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

**54.** *Id.* at 1155; *but see Hall v. Daka Intern., Inc.,* 949 F.Supp. 969, 974 (N.D.N.Y.1996) ("the analysis of whether an employee is 'qualified' under the *McDonnell Douglas* test often folds into the analysis of whether the employer had a nondiscriminatory reason to [take the adverse employment action.]"); *Farber v. Arrow Co.,* No. 82 Civ.

7563(JFK), 1985 WL 1076, at *3 (S.D.N.Y. Apr. 29, 1985) ("The second and third steps of the *McDonnell Douglas* test collapse into the dispute as to whether a prima facie case was established . . .")

**55.** 580 F.2d at 1155.

**56.** *Id.*

**57.** 630 F.2d 60 (2d Cir.1980).

**58.** *Id.* at 64.

**59.** *Id.*

**60.** 104 F.3d 26 (2d Cir.1997).

**61.** *Id.* at 30.

Both *Lieberman* and *Thornley* are in some tension with *Powell'*s injunction against collapsing the stages of the *McDonnell Douglas* analysis, and Feder's case evokes this tension. *Lieberman* and *Thornley* indicate that the Court should consider BMS's criteria in determining whether Feder was qualified for the position she sought.[62] The problem with doing so is that Feder claims that these criteria were pretextual and that a real criterion was a Y chromosome. In other words, consideration of Feder's qualifications in light of BMS's professed criteria necessarily would implicate the subsequent stages of the *McDonnell Douglas* analysis in apparent contravention of *Powell.*

Where there are objective criteria for employment or promotion, a plaintiff usually can introduce evidence of qualification that is remote from the issue whether the employer's stated reasons for its actions are a pretext for something else. The plaintiff either has the qualifications or does not. In such cases, it makes sense to screen out plaintiffs who cannot offer evidence which, if believed, would demonstrate satisfaction of objective standards before putting the employer to its proof because the issue is distinct from the ultimate question of discriminatory motive.

█ Here we have something quite different. Weg testified that he chose Hayden for the position in September 1995 because of his experience in strategic thinking, as a successful general manager, and in sales and marketing.[63] Moreover, during his 14–year tenure at BMS, Hayden had been identified as an individual with great potential who ought to be exposed to a variety of functions to further his development.[64] Weg asserted that he did not consider Feder to be a viable candidate for the job because she had been with the company only seven months, was

still learning, and had no marketing or line management experience.[65]

While these criteria superficially sound objective, they really are not unequivocally so. They reflect, at least to a degree, Weg's subjective assessment of the skills required of the successful candidate. Moreover, the issue of whether these in fact were the criteria that Weg employed in choosing a replacement for Bodnar is indistinguishable from the ultimate issue on the merits.[66]

It is important to bear in mind that the plaintiff's burden in making out a *prima facie* case is "not onerous." [67] This suggests the conclusion that Feder has offered evidence which, if believed, would demonstrate that she was qualified for the position. Any different view would eviscerate the *McDonnell Douglas* framework in cases involving professional and managerial personnel by collapsing the ultimate issue of the reason(s) for the adverse employment action with the *prima facie* case. While there are legitimate questions as to the utility of the *McDonnell Douglas* framework, this Court is bound to employ it. In consequence, the Court holds that BMS has failed to demonstrate that there is no genuine issue of fact material to the determination whether Feder was qualified to succeed Bodnar in 1995 and assume the responsibilities for Franchise Management and Business Development and Licensing.

*4. The Fourth Element*

Feder has satisfied the fourth *McDonnell Douglas* element with respect to the September 1995 promotion. The position to which Feder aspired was filled by a man, Hayden,

---

**62.** This question does not apply to the claim stemming from the February 1997 reorganization. Defendant does not claim that Feder did not receive a reporting relationship to Weg because of her insufficient qualifications, but rather because Weg had too many direct reports at the time. Weg Dep. 155–56.

**63.** Weg Dep. 216–17.

**64.** Tharp Dep. 151–52.

**65.** Weg Aff. ¶ 4.

**66.** *See Naftchi v. New York University,* 14 F.Supp.2d 473, 480–81 (S.D.N.Y.1998); *Tavoloni v. Mount Sinai Medical Center,* 26 F.Supp.2d 678, 681 (S.D.N.Y.1998).

**67.** *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *see also Sutera v. Schering Corp.,* 73 F.3d 13, 16–17 (2d Cir.1995) (*"de minimis"*).

which suffices to establish a *prima facie* case.[68]

The question is considerably more troublesome as to the February 1997 reorganization. The position that Feder claims she should have received was abolished, so the place she claims should have been hers did not go to a man. Nor does such a simple approach provide any answers with respect to the failure to give her a direct reporting relationship with Weg. This is particularly true because Poon, another woman, was given such a reporting relationship, so it cannot be said that a man, or men, received whatever opportunities were available. Hence, Feder established a *prima facie* case as to the reorganization only if it took place in circumstances giving rise to an inference of discrimination. As this is substantially the same question as the ultimate issue, the Court assumes *arguendo* that she has made out a *prima facie* case and proceeds to the merits.

### C. *Evidence of Discrimination*

BMS has articulated legitimate business reasons for promoting Hayden and not Feder to replace Bodnar in September 1995 [69] and for not promoting Feder in February 1997.[70] The burden therefore shifts to Feder to produce sufficient evidence which, if believed, would permit a reasonable jury to conclude that her gender was a motive in BMS' decision not to promote her.[71]

Feder advances a litany of alleged indications of Weg's gender bias which, she argues, are sufficient to give rise to an inference of discrimination.[72] It is important, however, first to identify just what the record does and does not support.

### 1. *Alleged Inconsistencies and Implausibilities*

### a. *Alleged Inconsistencies Regarding the 1995 Promotion*

Feder argues first that the reasons advanced by BMS for promoting Hayden rather than her are inconsistent with its actions, thus raising a factual inference as to pretext and supporting an inference of discrimination.

(1) Feder begins by asserting that Weg's claim that he "chose Hayden over Feder in September 1995 because [he] wanted someone with 'line management and sales and marketing experience' is completely inconsistent with everything Feder had been told since she was first courted by BMS, including: Sloan's representation that she was expected to succeed Bodnar ...; [and] Weg's comment that as of September 1995 she was still on track for that pre-employment commitment...." [73] But there are problems with plaintiff's fidelity to the record.

To begin with, there was no commitment to Feder that she would succeed Bodnar. According to Feder's testimony, viewed in the light most favorable to her, Sloan told her during a pre-employment interview that Bodnar was not expected to stay in his job for long and that if Feder was hired "it was the expectation that [Feder] would succeed Dr. Bodnar." [74] At best, therefore, Feder received nothing more than a statement of expectation as to the course of her future promotion, not a commitment.

Nor did Weg confirm any such commitment. Feder testified only that *she* "specifically talked about a preemployment commitment" and that "he seemed comfortable with

---

**68.** *Quaratino*, 71 F.3d at 64; *see also Fisher*, 114 F.3d at 1335.

**69.** *See supra* at 327.

**70.** BMS claims that it did not alter Feder's reporting relationship in February 1997 because (1) "Mr. Weg did not believe he should add another direct report at a time when he had so many direct reports who were new to their positions," (2) Feder and Hayden worked well together, and (3) Weg wanted continuity in licens-

ing and external development. Def. Mem. 17–18.

**71.** *See Fisher*, 114 F.3d at 1337.

**72.** Only Weg is alleged to have discriminated against Feder.

**73.** Pl. Mem. 17.

**74.** Feder Dep. 137, 141. Sloan, it should be noted, denied any such statement. Sloan Dep. 140.

my statements."[75] There is no evidence that Weg knew that Feder's reference to "a preemployment commitment" was shorthand for an alleged promise by Sloan that she would succeed Bodnar. His silence in the face of Feder's statement therefore is not evidence that he knew of, much less had concurred in, any such promise. Indeed, when Feder was pressed on this point, she testified that she simply assumed that Weg knew that Sloan had promised her Bodnar's job.[76]

Feder's claim of a broken commitment that she would succeed Bodnar thus is an exaggeration. The most that can be said is that there is evidence that (i) Sloan told Feder when she was hired that the expectation was that she would succeed Bodnar, and (ii) Weg concluded about a year later that Feder would not receive that job.

(2) Feder next asserts that Bodnar told her that he recommended that Feder replace him,[77] a fact that is said to show that Weg's contention that he did not regard Feder as qualified to succeed Bodnar is untrue. The most that can be said for Feder's position on this point, however,[78] is that there is some evidence suggesting that Bodnar told Weg that he regarded her as qualified.

(3) Feder next claims that Weg's statement that he did not consider Feder for Bodnar's replacement because, among other things, she had been at BMS only for seven months[79] is inconsistent with the fact that Hayden and Hinson were promoted in February 1997 after only short periods in their prior positions.[80]

Feder's comparison of herself to Hayden on this dimension is inapposite. Weg's point was not that Feder had been *in her job* too briefly to permit promotion; it was that she had been with the company for too short a time.[81] While Hayden was promoted after nine months in his prior position, he had been at BMS for over 14 years.[82]

Hinson presents a different issue. Unlike Hayden, he was new to BMS.[83] In consequence, he and Feder were situated similarly in this respect, and it is not clear why he was regarded as fit for promotion in February 1997 while Feder's brief tenure was viewed negatively in 1995. BMS attempts to distinguish the two situations, explaining that Hinson was promoted from one marketing position to another while the promotion that Feder claims should have been hers would have added new responsibilities in areas in which she had no prior experience.[84] But Weg's affidavit, viewed in the light most favorable to Feder, suggests that the brevity of her tenure with the company played a role in precluding her promotion. Thus, there arguably is an inconsistency between one aspect of Weg's explanation for the failure to promote Feder and his action in promoting Hinson.

(4) Feder argues last that Weg's current explanation for the failure to promote her—lack of relevant experience and tenure with BMS—is inconsistent with what he told her, viz. that she was not reporting to him because he did not want more direct reports.[85] But she confuses apples with oranges.

According to Feder, she asked Weg in 1997 "why [she] wasn't reporting to him directly"[86]—not why she had not been given the job given to Hayden in September 1995. Weg allegedly responded that she "shouldn't

---

75. Feder Dep. 249–50.

76. *Id.* at 250.

77. Pl. Mem. 17; Pl. 56.1 St. ¶ 29.

78. It should be noted that Bodnar did not corroborate Feder on this point. He testified that he recommended to Weg, in the course of discussing succession in the event Bodnar "were run over by a bus," that he, Bodnar, not be replaced, but that Weg should have both Feder and Hayden report directly to him. Bodnar Dep. 28–29.

79. Weg Aff. ¶ 4.

80. Pl. Mem. 18.

81. *Id.*

82. Hayden Dep. 5.

83. Tharp Dep. 87.

84. Def. Reply Mem. 4.

85. Pl. Mem. 17–18.

86. Feder Dep. 244.

misconstrue that, that he viewed [her] as a superstar and a very high potential person, that he did not want to increase his number of direct reports and that ... he didn't want to have any extra supervisory responsibilities."[87] Hence, Weg responded to the question he was asked, which concerned the lack of a direct reporting relationship, not the reason why Feder did not receive a bigger job.

To be sure, Feder contends also that Weg's explanation for the lack of a direct reporting relationship was untrue. Contrary to his current testimony, she claims, Weg in February 1997 increased the number of people reporting directly to him.[88] But the record does not bear out that assertion.[89]

### b. Alleged Inconsistencies Regarding the February 1997 Reorganization

Feder takes a similar approach to the February 1997 reorganization, seeking to impeach Weg's explanation of his actions by showing that it is inconsistent with his prior actions and statements.

(1) Feder begins by arguing that Weg's explanation for aspects of the February 1997 reorganization – that the reorganization left Feder reporting to Hayden rather than promoting her to a direct reporting relationship with himself because Feder worked well with Hayden and Weg wanted continuity in licensing – must be false because his original plan would have had Feder report to Hinson.[90] But there is no inconsistency.

Weg testified that his preferred option was to place Hayden in charge of the entire Intercontinental unit,[91] a course that would have severed the reporting relationship between Hayden and Feder. When he presented his proposal to Heimbold, BMS's chief executive officer, however, the two disagreed. Heimbold took the position that running all of Intercontinental was too much for Hayden and that he wanted Hayden and Feder to continue to work together, as they had done well together in the past.[92] While Weg then sounded out Hayden and Poon concerning his original plan, Poon objected and the issue returned to Heimbold, who decided that Intercontinental would be split and that Feder would continue reporting to Hayden.[93] Hence, Weg's original plan to break up Hayden and Feder was inconsistent with the explanation for the ultimate decision because the ultimate decision was Heimbold's, not Weg's. Weg was consistent throughout.

(2) Feder next asserts that Weg's explanation – that he had too many direct reports – does not explain why she was treated differently than similarly situated males in being denied a reporting relationship to Weg. But there is no evidence that women were treated differently. Poon was promoted to report to Weg. Moreover, the fact that some men were given such reporting relationships simply is not probative. There is no evidence regarding the gender distribution of the entire universe of potential promotees. Nor could there be statistically significant evidence that a higher proportion of eligible men than of eligible women were promoted given the small numbers involved.[94]

### 2. Alleged Sex Stereotyping

Feder argues that an inference of discrimination reasonably might be drawn because "Weg engaged in sex stereotyping"—he de-

---

87. *Id.*

88. Pl. Mem. 18.

89. Plaintiff's memorandum cites paragraph 49 of her Rule 56.1 Statement in support of this assertion. Paragraph 49 states only that "nine men were promoted and/or received new responsibilities as a result of the February 1997 reorganization." While it relies on Feder's affidavit, the affidavit says only that Weg had hired, transferred or promoted at least nine men to report to him since Feder arrived at BMS. Feder Aff. ¶ 16. But there is no evidence in the affidavit or elsewhere to support the assertion that more people reported directly to Weg after the reorganization than before.

90. Pl. Mem. 19.

91. Weg Dep. 154–55.

92. *Id.* at 155–56.

93. *Id.* at 156–67.

94. *See Pollis v. New School for Social Res.,* 132 F.3d 115, 123 (2d Cir.1997) (statistical evidence "too scant and too flawed" to support inference of discrimination).

scribed Feder as "hostile" in his deposition, an adjective Feder equates with "hysterical." [95] This comment, Feder argues, demonstrates Weg's belief that "Feder's behavior was not sufficiently feminine" and might bias his promotion decisions. [96]

Feder's argument is unpersuasive. The word "hysterical" is commonly used to describe behavior often viewed negatively. It has a female gender-specific etymological root, as it is derived from the Greek word for uterus. Its use therefore inaccurately associates such undesirable behavior with women despite the fact that both men and women on occasion may exhibit that behavior. In consequence, its use understandably is objectionable to some and may reflect a lack of sensitivity. But the word "hostile" has no such origin. [97] Moreover, both men and women are accused of hostility. Hence, while the use of "hostile" with respect to women in some circumstances may reflect an outmoded sexual stereotype, the term does not inherently do so. The question whether its use is suggestive of insensitivity or bias thus is highly dependent on the circumstances in which it is used.

■ In this case, Weg did not characterize Feder as "hostile" although he did use the word "hostility." He was asked during his deposition whether he ever had discussed with Tharp the possibility of Feder leaving the company. He said that he had done so in 1997 after he saw two letters from Feder. [98] One of the letter—by Feder to Weg—is in the record. [99] The letter expressed Feder's "profound disappointment" concerning the February 1997 reorganization, urged reconsideration "in the strongest terms," suggested that the reorganization was not "in the best interests of the company," referred to Weg's appointment of her to the Worldwide Medicines Operating Committee as a "gesture" and questioned "the significance [Weg] place[d] on this appointment," asserted that "performance can not [have been] the basis of the decision to have [her] report to someone other than" Weg, complained that Weg's 1995 explanation of his decision not to have Feder report directly to him was untrue, and characterized the action as an "inexplicable [personal] rebuff." Weg testified that, following his receipt of this letter, he told Tharp that Feder was creating friction in the company and "was expressing a lot of hostility to" Weg and others. [100]

Weg's statement that Feder expressed hostility thus was markedly different from those made in *Price Waterhouse v. Hopkins*, [101] where plaintiff was described by one partner as " 'macho,' " another said that she " 'overcompensated for being a woman,' " and a third said she ought "to take 'a course at charm school.' " [102] There simply is nothing reflective of gender animus in Weg's statement, given the circumstances in which it was made.

### 3. Alleged Disparity in Promotion Criteria between Men and Women

Feder next contends that Hayden was promoted in 1995 despite the lack of international experience and of much experience in business development and licensing whereas she was passed over because she lacked experience in line management and marketing. This, Feder argues, demonstrates that Weg applied different standards for the promotion of men and women. [103]

---

95. Pl. Mem. 20.

96. *Id.*

97. *See* THE OXFORD ENGLISH DICTIONARY Vol. VII, 420 (2d ed.1989).

98. Weg Dep. 194–96.

99. Plevan Aff. Ex. M.

100. Weg Dep. 194.

101. 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

102. *Id.* at 235.

103. She contends also that the disparity in standards is further exemplified by the fact that Hayden and Hinson were promoted in February 1997 after only short periods in their prior positions while Weg claimed that was the very reason she was not promoted in September 1995. Pl. Mem. 20–21. The alleged disparity in the promotion schedule of men and women is discussed at length above and need not be repeated here.

That one of the "pros" of promoting Hayden to replace Bodnar was that "it would give him exposure to [BMS's] international operations"[104] does nothing to establish that Weg applied different criteria in promoting men and women. It is rare in any organization to find a candidate who has had previous experience with each and every element of the job description for a position to be filled. Candidates have strengths and weaknesses, and employers must make judgments about whether the strengths outweigh the weaknesses, bearing in mind which qualifications are the most important and which less so. Moreover, most organizations are interested in developing employees by gradually broadening their ranges of experience so that they are better able to take on increased responsibilities as time goes by. A lack of experience with respect to one dimension of a particular job therefore may be a factor counseling against hiring or promoting for that position if the dimension is sufficiently significant. But it also may afford an opportunity to remedy that lack of experience provided the other factors favoring the appointment are sufficiently strong. Feder admitted as much by acknowledging that in her experience "people sometimes [are] put in jobs that they don't know extremely well in order to give them the opportunity to learn more about that area of the business."[105]

Of course, it would be unlawful for an employer to view shortcomings as opportunities in the case of male job candidates and as deficiencies in the case of women. But there is no such evidence here. For one thing, the promotion of Hayden despite the lack of international experience is simply an anecdote about one promotion decision, not evidence that men generally, or even frequently, were treated more favorably than women. Even more important, it is undisputed that Feder received similar treatment, albeit not on this particular occasion. In hiring Feder, BMS increased her salary more than 40 percent over her salary at Sandoz,[106] and described the job as "a good development opportunity" for Feder,[107] thus evidencing its willingness to develop female executives. Indeed, Feder acknowledged that she had no "direct managerial experience or responsibility" in her prior job and that she regarded the BMS job "as a career development opportunity."[108] She admitted that she would have to learn various aspects of the job.[109]

### 4. Alleged Devaluation of Women at BMS

Plaintiff's next contention is that Weg devalued other high level women. But her memorandum refers only to Christine Poon and the February 1997 reorganization.[110]

Feder points to Weg's initial plan for the February 1997 reorganization, which would have given Hayden responsibility for the Pharmaceutical Group's entire international operations (other than Europe) and asserts that Poon was mistreated because she had managed Latin America and Canada while Hayden's international experience was limited.[111] The fact that Poon would have been placed under an executive less experienced in her specialty, according to Feder, is evidence of gender discrimination.

Plaintiff makes more of this incident than the evidence will bear. There certainly is no evidence that Poon's gender had anything to do with the proposal. Nor is there evidence as to whether Hayden's relative inexperience with international matters was or was not outweighed by experience superior to Poon in other aspects of the business relevant to the job. In any case, Poon complained about the arrangement, and Hayden expressed reservations about having her reporting to him. The result was a change in the plan pursuant to which Poon continued in charge of Latin America and Canada and was elevated into a direct reporting relationship with Weg rather

---

104. Weg Dep. 233.

105. Feder Dep. 149.

106. *Id.* at 185–87.

107. *Id.* at 120.

108. *Id.* at 125, 149.

109. Weg Dep. 35; *see* Feder Dep. 149.

110. Pl. Mem. 21–22.

111. Pl. Mem. 5–6, 21; Pl. 56.1 St. ¶ 47.

than reporting to Hayden as initially planned.

### 5. Allegedly Direct Evidence of Gender Bias

Finally, Feder complains of allegedly direct evidence of gender bias. She relies upon three incidents.

### a. Weg's Comment Relating to Leung's Transfer

The first occurred in the summer of 1995, when Feder recommended to Weg that Alice Leung be transferred to head up Licensing. Weg expressed concern "that a woman might not be effective in doing deals in Japan" and indicated that the position required a scientific degree, but told Feder that the decision and the responsibility for it ultimately would be hers.[112] He did, however, ask that she hire a headhunter first, obviously to see whether a better candidate was available.[113] Leung ultimately received the appointment.

Feder argues that Weg's comment regarding Leung is evidence of gender animus and is probative of her contention that Feder was passed over because of her gender. She relies on a line of cases holding that customer preferences are not *bona fide* occupational qualifications and therefore are not within a statutory exception to the restrictions of Title VII.[114]

The *bona fide* occupational qualification cases stand for the proposition that one cannot justify otherwise unlawful discrimination on the ground that one's customers do not like to deal with members of a protected class. They reflect the view that the goal of equality is served best by eliminating the ability of customers to undermine the employment discrimination laws by imposing their prejudices on employers as well as the ability of employers to continue in discriminatory practices by blaming their customers. But the question whether Weg's statement concerning dealings between Japanese and women warrants an inference of discriminatory animus and that any such animus affected Feder for an entirely different position, however, is a different matter. In consequence, the *bona fide* occupational qualification cases are not directly applicable.

The question remains whether Weg's apparent inclination to pass over Leung for a particular job transfer because of professed concern about anti-female bias among Japanese customers is probative of his motivation in dealing with Feder. The most plausible interpretation of Weg's alleged remark is that it evidenced a desire to avoid hurting BMS with a particular group of customers even if that meant depriving Leung of this opportunity. If that interpretation is correct, the remark is of no probative value with respect to Feder because there is no evidence that any of the promotions or other changes that Feder desired required significant dealings with the Japanese. In other words, the circumstances that would have motivated Weg in relation to Leung's transfer simply would not have existed in relation to Feder. On the other hand, it perhaps is conceivable that the remark concerning Leung's transfer reflected a more general bias against women and that the reference to difficulties for women in dealing with Japanese customers was intended to conceal that more general bias. But the mere possibility that such was the case is insufficient. Speculation and conjecture are not valid bases on which a jury reasonably could find the existence of gender bias.[115] Whether that infer-

112. Feder Dep. 300–01.

113. *Id.* at 301.

114. 42 U.S.C. § 2000e–2(e) permits the use of gender in hiring decisions so long as it is a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." The weight of authority is that customer antipathy to members of protected groups does not make membership in a more favored group a *bona fide* occupational qualification. *See, e.g., Fernandez v. Wynn Oil*

*Co.,* 653 F.2d 1273, 1276 (9th Cir.1981); *Diaz v. Pan Am. World Airways,* 442 F.2d 385, 389 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *Bollenbach v. Bd. of Educ. of Monroe–Woodbury Cent. Sch. Dist.,* 659 F.Supp. 1450, 1472 (S.D.N.Y.1987).

115. *Jund v. Town of Hempstead,* 941 F.2d 1271, 1290 (2d Cir.1991) (citing 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2537, at 599 (1971)); *see also Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture, and speculation,

ence would be a reasonable one must be considered in the context of all of the evidence.

### b.  The Barker Comment

Next, Sam Barker in 1996, in the context of a conversation concerning how difficult the working relationship between Feder and him had been at the outset, told her that she should not have come to BMS because she didn't look, act or talk "like us."[116]  The comment, however, was too cryptic to justify assigning gender as its motive.  In any case, in view of the fact that Feder bases her claim exclusively on alleged discrimination by Weg, Barker's alleged comment to her is not probative.

### c.  The Hamad Remark

Finally, Feder's brief claims that Samuel Hamad, in the presence of bothFeder and Weg, allegedly attributed the success of a rival to its not having "women and mustaches" on its sales force,[117] but was not reprimanded by Weg, who denies having heard the remark.[118]  But plaintiff's argument loses steam upon turning to the deposition.  Feder testified, in fact, that Hamad said that he asked about the rival's sales force and *"was told* that the reason that Astra is so effective is that they do not allow women [and] mustaches in their sales force."[119]  Thus, Hamad attributed the comment to an unidentified third party.  There is nothing in the record that suggests that Weg's silence in the face of this remark reflected approval.

### D.  Analysis

Having thus sifted through the record, one finally may focus on the evidence that argu-

ably supports Feder's position.  It boils down to this:

Viewing the evidence in the light most favorable to the plaintiff, a jury would be entitled to conclude that (a) Feder was hired with the expectation that she would succeed Bodnar, (b) when Bodnar left the position about a year later, Weg appointed Hayden. (c) Weg in February 1997 formulated a reorganization plan that would have had two experienced women—Feder and Poon—reporting to two men with less experience in their specific areas but then altered the plan when Poon objected and promoted Poon, (d) Hinson, rather than Feder, was promoted to replace Hayden in February 1997 after having been at BMS for only a short period of time, (e) Weg questioned whether a woman would be able to deal effectively with Japanese, and (g) Weg voiced no objection to Hamad's comment that someone had told him that Astra's sales success was attributable to its having no "women or mustaches" in its sales force.

A trier of fact perhaps would be permitted to infer that Sloan would not have told Feder that it was the expectation that she would succeed Bodnar unless he had good reason to know that Weg shared that view.  If that is so, then Weg's contention that Feder lacked the necessary sales, marketing and line management experience even to be considered for Bodnar's job when it became available during the following year is debatable; while he may have found after Feder arrived at BMS that she was less experienced than he believed when Feder was hired, it is more likely that he was aware of Feder's background when she was hired and that the experience justification is simply a pretext for some other reason.  Further, BMS has

---

however, are insufficient to create a genuine issue of fact."); *Hollander v. American Cyanamid Co.*, 999 F.Supp. 252, 260 (D.Conn.1998) (allowing a jury to speculate among three possibilities would be impermissible).

116.  Feder Dep. 297.  In fact, Feder's initial recounting quoted Barker as saying that she did not look, act or talk like Barker.  *Id.* The text assumes the truth of the version of Feder's two accounts more favorable to her claim.

117.  Feder Dep. 302.

118.  Weg Dep. 207.

119.  Feder Dep. 302 (Emphasis added).  Feder's affidavit tells the story in a manner more favorable to her in the sense that it implies that Hamad held the view that he in fact attributed to someone else.  Feder Aff. ¶ 24.  Under settled Second Circuit law, however, statements in affidavits in opposition to motions for summary judgment which contradict the affiants' deposition testimony are to be disregarded.  *See, e.g., Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987).

offered no compelling explanation of why Hinson was promoted after less than a year with the company but Weg relied upon Feder's comparably brief tenure to justify his failure to promote her in September 1995. Hence, the evidence raises an issue of fact as to whether Weg's explanations for his actions with respect to Feder are entirely accurate. But the existence of an issue of fact with respect to pretext is not sufficient to require denial of BMS's motion.

As the Second Circuit reminded in its recent *in banc* decision in *Fisher,* "the presumption of discrimination that was raised upon a showing of the prima facie case no longer operates" once the defendant has articulated a non-discriminatory explanation for its actions.[120] And it is not always enough for a plaintiff to raise a genuine issue of fact as to the truth of the defendant's explanation, as

> "discrimination does not lurk behind every inaccurate statement. Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, logrolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." [121]

Hence, even though Feder has raised an issue of fact as to pretext, she still may not defeat BMS's motion unless she has adduced evidence from which a trier of fact reasonably could conclude that BMS's explanation is "a pretext *for discrimination,* either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." [122] In other words, the plaintiff must offer evidence sufficient to raise a genuine issue of fact not only as to pretext, but also as to

whether "the true reason was ... illegal discrimination ..." [123] And in considering a motion for summary judgment, "no special rules [apply.]" [124] "As in any other type of case, the judge must analyze the evidence, along with the inferences that may reasonably be drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination." [125]

■ Promotions at the high corporate level at issue here virtually always are affected by institutional politics, personal loyalties, and personality. Certainly there is evidence – indeed, evidence upon which Feder relies—that Hayden was being groomed for advancement to the highest level of management.[126] That he was promoted in preference to Feder therefore is not surprising, yet BMS may be unwilling publicly to annoint him as a likely successor to its most senior corporate executives. Feder's letter to Weg, quoted above, while it of course post-dates some of the matters complained of, is written with a tone and a bluntness that suggests the possibility that she may have offended one or more of her superiors, yet an unwillingness to acknowledge that important decisions were made on such a basis would not surprise. This bluntness, however, was not simply a product of these matters. Feder testified that during an initial interview with BMS she stated "that [she] was direct and candid and uncompromising and that [she] did not always choose to be diplomatic, but [she] choose[s] – preferred to be very clear." [127] Moreover, she acknowledged in her deposition that she was not well liked at Sandoz and that she initially did not work well with a senior colleague at BMS.[128] And it is possible that discrimination on a basis other than gender was at work.[129]

120. *Fisher,* 114 F.3d at 1336.

121. *Id.* at 1337.

122. *Id.* at 1339.

123. *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir. 1997).

124. *Fisher,* 114 F.3d at 1347.

125. *Id.*

126. *See* Tharp Dep. 151–53; Weg Dep. 233.

127. Feder Dep. 125. Feder acknowledges also that it was her belief that she was not always well liked at Sandoz, and that people there used to joke "it's very easy to respect you, it's not always so easy to like you, but it's always good to work with you." *Id.* at 126.

128. Feder Dep. 297.

129. Feder is an observant Jew. *See* Feder Dep. 244. While discrimination on the basis of religion would be unlawful, Feder has made no such claim.

The significance of these possibilities is not that any has been established as a reason for any lack of accuracy in BMS's explanations of its actions. Rather, they demonstrate that the existence of an issue of fact as to whether Weg's explanations are entirely accurate does not itself point to gender discrimination as a basis for his decisions, as there are other possibilities. So the question is whether there is enough other evidence in the record to raise a genuine issue of fact as to gender having been a determinative factor.

Other than the inconsistencies concerning the significance of Feder's level of experience and tenure with the company, there is precious little evidence at all. While Feder has sought to create the impression that Weg advanced a stream of male executives and did not treat comparable women similarly, there in fact is no evidence that this is so. Without knowing the size and gender distribution of the pool of executives arguably eligible for promotion to senior levels, it is impossible to say whether a higher proportion of eligible men than of eligible women has been promoted.[130] Feder's anecdotal evidence shows only that Christine Poon was promoted and moved into a direct reporting relationships with Weg while Feder did not achieve that goal without Heimbold's inter-vention. And surely there is no evidence of employment policies or practices that systematically disadvantaged women.

In the last analysis, Feder's evidence of gender discrimination boils down largely to Weg's alleged comment concerning the proposed transfer of Leung into a position in which she would be responsible for dealing with Japanese customers. But that at best highly ambiguous remark cannot be considered in isolation.[131] It is undisputed that Weg (a) approved Feder's hiring to a senior position,[132] which represented a substantial career development opportunity for her and greatly increased her compensation, (b) repeatedly approved salary increases and bonuses for Feder,[133] and (c) ultimately promoted her to a direct reporting relationship with him. The weakness of Feder's *prima facie* case must be borne in mind as well.[134] In all the circumstances, the Court holds that no trier of fact reasonably could conclude that Feder's gender was determinative in the employment decisions complained of.[135]

## II. *The Retaliation Claim*

In March 1997, Feder told Tharp that she thought she had been denied a promotion

130. There are problems also with statistical analyses of small universes of eligible employees. *See Waisome v. Port Authority of New York & New Jersey*, 948 F.2d 1370, 1378–79 (2d Cir.1991); *see also Pollis v. New School for Social Res.*, 132 F.3d at 123 (statistical evidence "too scant and too flawed" to support inference of discrimination); *Guinyard v. City of New York*, 800 F.Supp. 1083, 1089 (E.D.N.Y.1992) (with a small sample size, slight variations in data can lead to large differences in the result).

The effort in Feder's affidavit to portray Weg as willing to have only men reporting to him by referring only to promotions of men into such reporting relationships is misleading. The affidavit is silent as to women promoted to report directly to Weg, and we know that at least Christine Poon received such an elevation. Nor is there any evidence as to the numbers of men and women who arguably were qualified for such promotions.

131. *See Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309 (6th Cir.1989) (statement by supervisor that he "needed younger blood" was too isolated and ambiguous to support a finding of discrimination).

132. Weg's approval of her hiring cuts against any inference of discrimination, although in this circumstance it is not conclusive. *See, e.g., Grady v. Aff. Central. Inc.*, 130 F.3d 553, 560 (2d Cir.1997).

133. Feder Dep. 185–87. Feder's base salary was increased from the $160,000 she last earned at Sandoz to $225,000 plus bonus when she joined BMS. *Id.* at 114, 185–87. When this motion was submitted, her salary and bonus exceeded $300,000 per annum and she received stock options as well. *Id.* at 185–95.

134. *Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 312 (2d Cir. 1997); *Fisher*, 114 F.3d at 1346.

135. *See, e.g., Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir.1994) ("some" evidence of discrimination is not sufficient to withstand motion for summary judgment; plaintiff must produce sufficient evidence to support a rational finding that the nondiscriminatory reasons proffered by the employer were false, and that more likely than not illegal discrimination was the real reason for the action taken).

due to discrimination.[136] In April, her attorney complained by letter to Heimbold.[137] Feder filed on EEOC charge in August, and Weg shortly thereafter recommended another reorganization to Heimbold.

The reorganization recommended in August was announced in November 1997, and it was extensive. Weg replaced Hamad with Peter Dolan in consequence of his dissatisfaction with Hamad. He promoted Poon to president of the Medical Devices Group. Hayden was given responsibility for all international operations. Barker took over the Franchise Management group, and Richard Lane took over Barker's former position as president for U.S. Pharmaceuticals.[138]

Feder's treatment in the reorganization was mixed. At Heimbold's direction, Weg altered Feder's reporting line to report directly to him and made her a member of his executive committee. She was given a substantial increase in salary and bonus as well as the new title of senior vice president, External Development. At the same time, Weg transferred Feder's licensing duties to Dr. Peter Ringrose, the head of BMS's research and development group known as PRI. This resulted in Feder losing "nearly half of [her] responsibilities, with the associated staff and budget," [139] although Feder has continued to work just as hard in consequence of her assignment to a variety of important special projects.[140] Feder claims that licensing was taken away from her in retaliation for her complaints of discrimination.[141]

■ The elements of a *prima facie* retaliation claim are that (1) the employee engaged in protected activity, (2) the employer knew of it, (3) the employer subjected the employee to a material adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action.[142] If the plaintiff establishes a *prima facie* case, the burden of going forward with evidence of a legitimate, nondiscriminatory reason for the action shifts to the defendant. If the defendant produces such evidence, the presumption falls away and the burden shifts back to the plaintiff to establish that the reason proffered is pretextual and that the impermissible retaliatory motive was a factor in the decision to take the action complained of.[143]

BMS concedes that Feder has satisfied the first two prongs but contests the third and fourth. It argues that Feder did not suffer any adverse employment action at all, but in fact received favorable treatment including two salary increases, the achievement of the coveted direct reporting relationship to Weg, a more prestigious title, and working contact with Heimbold.[144] It contends also that temporal proximity alone is not enough to establish a causal connection between Feder's protected activity and the transfer of her licensing responsibilities and, in any case, that seven months (the time between Feder's complaint to Tharp and the alleged discriminatory action) is "too long a period to create an inference of retaliatory motive." [145]

In moving licensing out of Feder's province, BMS eliminated half of her responsibilities with its associated staff and budgetary authority.[146] It at least is arguable that the

---

**136.** Feder Dep. 340–41; Tharp Dep. 102–08.

**137.** *See* Plevan Aff. Ex. N.

**138.** Plevan Aff. Ex. Q.

**139.** Feder Aff. ¶ 18.

**140.** Feder Dep. 216–17.

**141.** *See* 42 U.S.C. § 2000e–3; N.Y. Exec. L. § 296(1)(e); N .Y.C. AD. Code § 9–107(7); N.J.Stat. Ann. § 10:5–12(d).

**142.** *Holt v. KMI–Continental. Inc.,* 95 F.3d 123 (2d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997).

**143.** *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768–69 (2d Cir.1998); *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995); *see Fisher,* 114 F.3d at 1335.

**144.** Def. Mem. 27–28.

**145.** *Id.*

**146.** *See, e.g., Burlington Industries Inc., v. Ellerth,* 524 U.S. 742, — – —, 118 S.Ct. 2257, 2268–69, 141 L.Ed.2d 633 (1998).

elimination of these responsibilities is likely to affect adversely her future promotional and employment prospects, as it takes her out of a business activity in which she now has been engaged for years. Hence, while Feder undoubtedly benefitted from other aspects of the reorganization – not least by a substantial salary increase and her elevation to a direct reporting relationship with Weg – the Court cannot say that no reasonable trier of fact could conclude that Feder suffered a material adverse employment action when responsibility for licensing was taken away from her.[147] The question whether plaintiff has made out a *prima facie* case therefore turns on whether the temporal proximity of the shift in Feder's responsibility to her EEOC complaint was sufficient to justify an inference of causation.[148]

■■■ The requisite causal connection may be established indirectly by showing that the protected activity was closely followed in time by the adverse action.[149] In this case, the trier would be justified in finding that the adverse employment action began in August 1997 when Weg first recommended the reorganization to Heimbold and just a short time after Feder filed her EEOC complaint. At worst, the adverse action was taken in November 1997, three months after the EEOC complaint. In either case, the reorganization was sufficiently close to protected activity to permit an inference of causation.[150] Hence, Feder has established a *prima facie* case of retaliation.

Once again, BMS has adduced evidence of a nondiscriminatory motive.[151] The issue therefore is whether Feder has come forward with sufficient evidence to raise an issue of fact that defendant's proffered reason is a pretext for retaliation.[152] In this regard, Feder argues first that the timing of BMS's action is probative of pretext, and second that Weg admittedly found it difficult to work with her as a result of her complaints.[153]

While BMS offers a nondiscriminatory reason for the removal of licensing from Feder's responsibilities, it offers no explanation for the timing of Weg's recommendation to Heimbold—a matter of weeks after Feder brought her EEOC charge.[154] The absence of any explanation for the timing alone might be enough for a trier of fact reasonably to infer that a retaliatory motive was at work. But it is unnecessary to reach this question in view of the other evidence in this record.

Weg testified that after receipt of Feder's letters complaining about his actions, he told Tharp that " '[t]his makes it extremely difficult for me to work with Dr. Feder' " and that he discussed the possibility of her leaving the company.[155] To be sure, the existence of such feelings does not unequivocally indicate that Weg would retaliate against Feder. But a jury would be entitled to infer

---

**147.** *See, e.g., Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998) (transfer to position with less prestige and customer contact could be found a material adverse change); *de la Cruz v. New York City Human Resources Admin. Dept. of Social Services*, 82 F.3d 16, 21 (2d Cir.1996) (transferring plaintiff from a unit which provided prestige and opportunity for advancement to a less prestigious unit with little opportunity for professional growth "arguably altered the terms and conditions of his employment in a negative way.").

**148.** While defendant questions whether proximity alone is sufficient to establish an inference of causation, *see* Def. Mem. 28, the courts have not. *See Johnson v. Palma*, 931 F.2d 203, 208 (2d Cir.1991).

**149.** *E.g., Quinn*, 159 F.3d at 769; *Manoharan v. Columbia Coll. of Phys. & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

**150.** *See DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111 (2d Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987).

**151.** Def. Mem. 29.

**152.** *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1309 (2d Cir.1995); *Fisher*, 114 F.3d at 1337–38.

**153.** Pl. Mem. 31. Feder argues that this admission, coupled with Weg's characterization of Feder as "hostile" demonstrate retaliatory animus. For the reasons discussed above, the Court finds that no trier of fact could reasonably conclude that Weg's statement—that Feder's letter expressed "hostility" toward him—reflected animus, gender or retaliatory.

**154.** Rather, BMS merely explains why the actual restructuring occurred in December 1997. *See* Def. Mem. 10.

**155.** Weg Dep. 195–96.

from Weg's statement that his decision to strip Feder of responsibility for licensing was motivated in part by a desire for retribution. Moreover, such an inference is supported by the fact that Weg never solicited Feder's opinion regarding the restructuring of her group,[156] as a jury might conclude from that fact that Weg was as interested in punishing Feder as in improving the licensing business which had performed well under her leadership.

■ Defendant argues that its favorable treatment of Feder after her EEOC charge precludes any inference of retaliatory motive. There is a question, however, whether that favorable treatment was an effort to avert or undermine a claim of retaliation. After all, BMS has not explained why Feder, who had not reported to Weg when she ran licensing, was given a direct reporting relationship—along with a new title and direct contact with the chairman and chief executive officer—after Feder filed her charge and after a major part of her responsibilities was removed from her. On this record, the trier of fact would be entitled to infer that defendant's favorable treatment was intended to mask a retaliatory motive.

### III. *The Contract Claim*

Finally, Feder asserts that BMS breached its contract with her by failing to promote her to succeed Bodnar in 1995.

■ The short answer to this claim is that BMS did not breach its agreement because there was simply no agreement. BMS did not promise Feder that she would succeed Bodnar. At most, there was a statement of expectation.[157] Nothing in *Shebar v. Sanyo Business Systems Corp.*,[158] the only case relied upon by plaintiff, suggests that such a statement results in an enforceable commitment to make the expectation come true.[159] In consequence, plaintiff has no contract claim.

**156.** *Id.* at 101–02.

**157.** *See* Feder Dep. 137.

**158.** 111 N.J. 276, 544 A.2d 377 (1988).

*Conclusion*

Defendant's motion for summary judgment is granted in all respects except that the motion is denied with respect to plaintiff's claims of retaliation under Title VII, the NYSHRL, the NYCHRL, and the NJLAD.

SO ORDERED.

**159.** Inasmuch as plaintiff does not respond to BMS's argument that she has no breach of contract claim under New York law, Feder has conceded that point. It therefore is unnecessary to determine whether New York or New Jersey law governs the contract claim.